449 F.2d 1164
 2 ERC 1900, 146 U.S.App.D.C. 88, 1
Envtl. L. Rep. 20,397
 FRIENDS OF the EARTH and Gary A. Soucie, Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents, Citizens For Clean Air,
Inc., National Broadcasting Company,
Inc., Intervenors.
 No. 24556.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 10, 1971.
Decided Aug. 16, 1971.
 
 Mr. Geoffrey Cowan, with whom Messrs. Victor H. Kramer and James W. Moorman, Washington, D. C., were on the brief, for petitioners.
 Mr. Richard E. Wiley, General Counsel, Federal Communications Commission, with whom Messrs. Daniel R. Ohlbaum, Deputy General Counsel, and Edward J. Kuhlmann, Counsel, Federal Communications Commission, were on the brief, for respondents. Mr. John H. Conlin, Associate General Counsel, Federal Communications Commission, and Mr. Howard E. Shapiro, Atty., Department of Justice, also entered appearances for respondents.
 Mr. Lawrence J. McKay, New York City, for intervenor National Broadcasting Co., Messrs. Donald J. Mulvihill, Washington, D. C., Mathias E. Mone, New York City, Howard Monderer, Washington, D. C., and Roy L. Regozin, were on the brief for intervenor, National Broadcasting Co.
 Mr. Roger C. Wolf, Washington, D. C., was on the brief for intervenor Citizens For Clean Air, Inc.
 Mr. Jerome Congress, New York, N. Y., filed a brief on behalf of the New York City Environmental Protection Administration, amicus curiae.
 Before WILBUR K. MILLER, Senior Circuit Judge, McGOWAN and ROBB, Circuit Judges.
 McGOWAN, Circuit Judge:
 
 
 1
 Petitioners in this statutory review proceeding attack the dismissal by the Federal Communications Commission, without hearing or oral argument, of their fairness doctrine complaint in respect of Station WNBC-TV in New York City. The issue raised is that of the reach of the fairness doctrine in relation to product advertising, in this instance automobile and gasoline commercials. For the reasons hereinafter appearing, we think that the Commission erred in concluding that the advertising in question did not present a point of view favorable to one side of a controversial issue of public importance; and we remand for reconsideration and further inquiry by the Commission to determine whether the licensee has been adequately discharging its public service obligations by carrying a reasonable amount of information on the other side of the question, or whether it must take further positive actions, differing in either kind or degree from what it has been doing, in order to achieve the balance contemplated by the fairness doctrine.
 
 
 2
 * On February 6, 1970, petitioners[1] wrote a letter to WNBC-TV, complaining of the "spot advertisements for automobile and gasoline companies [which] constantly bombard the New York area viewers with pitches for large-engine and high-test gasolines which are generally described as efficient, clean, socially responsible, and automotively necessary." Petitioners referred to the following commercials as having been selected at random in the weeks immediately preceding their letter:
 
 
 3
 (1) January 26, 1970, 8:15 p. m., 30 sec., an advertisement for Ford Mustang, picturing the car on a lonely beach, and stressing its "performance" (large engine displacement);
 
 
 4
 (2) Same date, 8:45 p. m., 30 sec., an advertisement for Ford Torino stressing size;
 
 
 5
 (3) January 22, 1970, 6:51 p. m., 30 sec., an advertisement for Chevrolet Impala stressing the great value of its size ("you don't have to be a big spender to be a big rider"), including the standard 250-horsepower V-8 engine;
 
 
 6
 (4) January 5, 1970, 8:05 p. m., 30 sec., an advertisement for Ford Mustang and Torino GT, again stressing size ("4-barrel, V-8" and "up to 429 cubic inches") and advocating "moving up to" a larger car;
 
 
 7
 (5) December 10, 1969, 11:15 p. m., encouraging the use of high-test leaded gasoline for cold-weather starting ("the cold-weather gasoline").
 
 
 8
 Petitioners asserted, contrarily, that these products were especially heavy contributors to air pollution, which had become peculiarly oppressive and dangerous in New York City; and that they fell within the reach of the decisions of the Commission and of this court on cigarette advertising. Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), cert. denied sub nom., Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969). Petitioners noted that, just as the Commission in the case of cigarette advertising relied heavily upon the report of the Surgeon General's Advisory Committee, so had the Surgeon General, in his 1962 report on "Motor Vehicles, Air Pollution and Health," concluded that automobile emissions offer significant dangers to human health and survival-a conclusion reiterated by a more recent report issued by the National Academy of Science and the National Academy of Engineering. Reference was also made to the 1969 report of Mayor Lindsay's Task Force on Air Pollution, which said that "[T]he best way to cut down on dangerous hydrocarbons in the air is to cut down on horsepower."
 
 
 9
 Thus, so it was said, the treatment by the communications media of the relationship of air pollution to automobiles occurs in the context of a public controversy in which government officials and professional and lay people concerned about health are pitted against the automobile manufacturers and the oil companies, and presents a situation to which the fairness doctrine applies.[2] Petitioners asked that the licensee "promptly make known the ways in which it intends to discharge its responsibility to inform the public of the other side of this critical controversy;" and, although asserting financial inability to purchase time, offered to produce and make available to the licensee spot advertisements presenting the anti-autopollution case. Petitioners indicated that, if a satisfactory response was not forthcoming, complaint would be made to the Commission.
 
 
 10
 On February 18, the licensee replied. It took the position that the Commission's tobacco decision was limited by its terms to cigarette advertising, and that it did not, in the Commission's words in that decision, impose any fairness doctrine obligation "with respect to other product advertising." Further, said the licensee, there is no real controversy about whether transportation by automobile should continue and that, therefore, the advertising of automobiles and of the fuels which propel them is not related to any controversial issue of public importance. Finally, the licensee referred to a number of programs presented by it in which the problem of air pollution by automobiles had been discussed; and it suggested that this represented an adequate discharge of any public interest obligation it had to inform its viewers on this subject.
 
 
 11
 On March 14 petitioners wrote a letter to the Commission, attaching the foregoing exchange of correspondence with the licensee and lodging a formal complaint against WNBC-TV "for failure to fulfill its 'fairness doctrine' and 'public interest' obligations with respect to automobile and gasoline advertisements." Petitioners urged upon the Commission the applicability of its cigarette advertising decision to other health hazards, and to the increasing recognition by governmental and other experts that carbon monoxide pollution caused by automobiles had become a serious and substantial danger to health, particularly in New York City. They reasserted their contentions that the large-car and highpowered gasoline advertisements carried by the licensee were designed to promote the idea that these products presented no health hazards in fact. They also contended that the discussion programs cited by the licensee were no adequate offset to the many spot commercials which were aired repeatedly throughout the broadcast hours, including the times of maximum viewing. It was the petitioners' request of the Commission that "this complaint be investigated and that necessary and appropriate action be taken to bring WNBC-TV into compliance with the requirements of the Federal Communications Act."
 
 
 12
 This letter of complaint was supplemented on April 7 by a letter to the Commission from counsel for the petitioners in which the Commission's attention was drawn to the recently enacted National Environmental Policy Act of 1969, Public Law 91-190, 83 Stat. 852. Counsel pointed out that in this new statute Congress had emphasized the "critical importance of restoring and maintaining environmental quality," and had authorized and directed government agencies to advance these ends and to interpret and administer "the policies, regulations, and public laws of the United States * * * in accordance with the policies set forth in this Act." Counsel referred to the underlying report of the Senate Committee which indicated that this mandate was intended to extend to "the licensing functions of independent agencies as well as the ongoing activities of regular Federal agencies." S.Rep. No. 91-296, 91st Cong., 1st Sess. 14 (1969).
 
 
 13
 On June 20 the Environmental Protection Administration of the City of New York addressed a letter to the Commission in support of the petitioners' complaint. It described air pollution conditions in New York City, and asserted that they were presenting an increasingly serious danger to health. A similar supporting letter was sent to the Commission by Citizens for Clean Air, Inc., a New York membership corporation organized for the purpose of educating the citizens of the New York metropolitan area in the hazards of air pollution and the effective means of alleviating it. It pointed out that, although serious suggestions were currently being made for the prohibition of automobiles in Manhattan, the commercials in question were urging the use of cars of ever larger horsepower, thereby compounding the problem. This letter urged that the Commission conduct hearings "for the purpose of developing facts adequate to resolve the serious questions which have been raised"; and it indicated a wish to present testimony in any such hearings.
 
 
 14
 On June 13 the licensee wrote a letter to the Commission in which it reiterated its contention that the content of the commercials complained of did not constitute a discussion of the pollution issue. It also listed by title a number of programs carried by it which it characterized as a more than adequate discharge by it of any duty it may have had to inform the public of the anti-pollution viewpoint.
 
 
 15
 Counsel for the petitioners responded to this letter on June 30 in a letter which, among other things, described the ever-growing health hazard in New York City by reason of automobile-produced air pollution and challenged the claim by the licensee that its public service programs adequately countered the effect of the automobile and gasoline spot advertisements complained of. It asked the Commission to examine actual transcripts of the programs cited by the licensee as fulfilling its public interest obligations, and asserted that such an examination would demonstrate that a substantial gap remained in the licensee's presentation of the conflicting positions with respect to automotive pollution of the air.[3]
 
 
 16
 In a letter to petitioners dated August 5, 1970, the Commission reviewed the contentions made in the foregoing correspondence and reported its conclusion that "no action is warranted against WNBC." It recognized that automobiles "result in many deaths each year and because their gasoline engines constitute the main source of air pollution (S.Rep. No. 91-745, 91st Cong. 2d Sess. 3 (1970)), they raise most serious environmental problems." This was, however, said to be true of "a host of other products or services-detergents (particularly with phosphates), gasoline (especially of a leaded nature), electric power, airplanes, disposable containers, etc." Cigarettes, said the Commission, are distinguishable from products of this nature, since smoking them is a habit "which can fade away" without impact upon other aspects of life, and which official voices have urged the public to avoid or to abandon. Contrarily, the Government is not urging discontinuance of the use of automobiles, although it is beginning to recognize that farreaching action must be taken to accommodate the impact of automobiles upon the environment. The Commission asserted that the focus should probably be on such action and "not [on] the peripheral advertising aspect."
 
 
 17
 The Commission represented itself as being without power to take the kind of action which could solve or alleviate the air pollution problems caused by the use of automobiles. That was a matter about which it was not expert, and which falls within the competence of other agencies of the Government. The Commission also stated that there was a threshold issue as to whether the commercials complained of did in fact present one side of a controversial issue. It purported not to have the information available to exercise judgment on the question of whether the differences in the amount of time respectively involved in the advertising of large and small cars is sufficiently great to call for further time to be afforded to the side taken by petitioners. "We have," said the Commission, "no such information before us, but we decline in any event to extend the cigarette advertising ruling to these other products." It stated its belief to be that "we should adhere to our previous judgment that cigarettes are a unique product permitting the simplistic approach adopted in that field."
 
 
 18
 The Commission went on to say that, even if it be assumed to be wrong in that belief, it would not extend the cigarette ruling "generally to the field of product advertising." To do so would, said the Commission, "undermine the present system which is based on product commercials, many of which have some adverse ecological effects." It justified this conclusion by pointing to the fact that a licensee had a public interest obligation to provide discussions of the environmental issues affected by some of the advertised products, although it did not address itself to the content and volume of the programs relied upon by the licensee as discharging its obligations or make any findings in this regard. It thought that the approach of regulating product advertising is one which Congress could take, but, in the absence of action by Congress, the Commission should stay its hand.
 
 II
 
 19
 In this court the Commission asserted that "[T]he crucial issue in this case is whether the Commission reasonably refused to extend to gasoline and automobile commercials its ruling with respect to cigarette commercials." We have no difficulty in accepting this formulation of the issue, involving as it does a comparison of the record before us with that before the Commission and this court in Banzhaf.
 
 
 20
 The complainant in Banzhaf brought to the Commission's attention certain specific commercials which allegedly sought "to create the impression and present the point of view that smoking is socially acceptable and desirable, manly, and a necessary part of a rich full life." It was urged upon the Commission that such commercials took one side of a controversial issue of public importance, and that, under the fairness doctrine, the licensee was required affirmatively to make its facilities available for contrasting viewpoints. The licensee in Banzhaf represented that it had in fact broadcast a number of news and information programs about the impact of smoking upon health, and had carried some public service announcements of the American Cancer Society free of charge. Thus, said the licensee, its coverage of the health aspects of smoking had actually been in full compliance with the fairness doctrine, although it went on to insist that the fairness doctrine had no application to product advertising.
 
 
 21
 The Commission accepted the complainant's characterization of the cigarette commercials in question as presenting a distinct point of view on a controversial matter of public importance; and it regarded this as bringing the fairness doctrine into operation. The Commission did not require the licensee to provide a precisely equal amount of time for the anti-smoking position, and it left this matter of time and the type of programming to the good faith judgment of the licensee. It did, however, expressly direct licensees carrying cigarette commercials to provide "a significant amount of time for the other viewpoint." The vigorous challenge made in this court to the Commission's ruling did not prevail, and we upheld the Commission's action as against the manyfaceted attack mounted against it in the tobacco case.
 
 
 22
 Petitioners' letter of complaint to the Commission in the case presently before us called attention to certain commercials of the licensee which allegedly suggested that there were special virtues in cars of greater rather than lesser horsepower, and in gasolines of the high-test, leaded character. As the petitioners said in concluding their letter to the licensee, all of these advertisements, in a manner reminiscent of the themes sounded in the cigarette advertisements, "imply that the good life is somehow inexorably connected with the use of powerful cars and high-test gasoline." For this reason, it was said, these particular commercials reflected a point of view on the merits of the use of larger cars and more powerful fuels which, in the context of the current concern about the danger of air pollution to health, invoked the fairness doctrine.
 
 
 23
 No more than in Banzhaf did the Commission here deny the existence or the persuasiveness of expert evidence, from both official and private quarters, of the very real dangers to health presented by air pollution, and the significant degree to which automobile emissions both create and aggravate the air pollution problem. To this point, therefore, the pattern of the problem unfolding before the Commission and its response to it are very like that in Banzhaf. Where the Commission departs from Banzhaf is in insisting that, because cigarettes are unique in the threat they present to human health, the public interest considerations which caused it to reach the result it did in Banzhaf have no force here.
 
 
 24
 The distinction is not apparent to us, any more than we suppose it is to the asthmatic in New York City for whom increasing air pollution is a mortal danger. Neither are we impressed by the Commission's assertion that, because no governmental agency has as yet urged the complete abandonment of the use of automobiles, the commercials in question do not touch upon a controversial issue of public importance. Matters of degree arise in environmental control, as in other areas of legal regulation. To say that all automobiles pollute the atmosphere is not to say that some do not pollute more than others. Voices have already been lifted against the fetish of unnecessary horsepower; and some gasoline refiners have begun to make a virtue of necessity by extolling their nonleaded, less dynamic, brands of gasoline. Commercials which continue to insinuate that the human personality finds greater fulfillment in the large car with the quick getaway do, it seems to us, ventilate a point of view which not only has become controversial but involves an issue of public importance. When there is undisputed evidence, as there is here, that the hazards to health implicit in air pollution are enlarged and aggravated by such products, then the parallel with cigarette advertising is exact and the relevance of Banzhaf inescapable.
 
 
 25
 In its Banzhaf ruling the Commission was at great pains to warn that it did not contemplate its extension to product advertising generally; and the Commission's action now under review reflects, more than anything else, a purpose to make good on that representation. But the Commission has since been obliged to moderate its view that commercial advertising, apart from cigarettes, is immune from the fairness doctrine. On May 12 last it issued its ruling (FCC 71-526) in the so-called Chevron case where complaint had been made of gasoline commercials which allegedly made deceptive and misleading claims with respect to the product's capacity to minimize air pollution.
 
 
 26
 The Commission decided to take no action in Chevron because (1) the commercials there in question, far from suggesting that automobile emissions do not contribute significantly to the dangers of air pollution, urged that the gasoline being advertised was designed to reduce those dangers, and (2) the commercials were the subject of a pending Federal Trade Commission proceeding on a charge of false and deceptive advertising. In this context the Commission did not think that the purposes of the fairness doctrine were served by making it the occasion for a debate with respect to the efficacy of a commercial product. Of the applicability of the doctrine generally, however, the Commission said:
 
 
 27
 This is not to say that a product commercial cannot argue a controversial issue raising fairness responsibilities. For example, if an announcement sponsored by a coal-mining company asserted that strip mining had no harmful ecological results, the sponsor would be engaging directly in debate on a controversial issue, and fairness obligations would ensue. Or, if a community were in dispute over closing a factory emitting noxious fumes and an advertisement for a product made in the factory argued that question, fairness would also come into play.
 
 
 28
 On June 30 last, the Commission in the so-called Esso case (FCC 71-704) sustained a fairness doctrine complaint which it thought to come within the range of these examples. Complaint had been made about commercials sponsored by Standard Oil Company of New Jersey which related to the development of oil reserves in Alaska, and which were said "to discuss one side of controversial issues of public importance, namely (1) the need of developing Alaskan oil reserves quickly and (2) the capability of the oil companies to develop and transport that oil without environmental damage." The licensee took the position that the commercials in question were institutional advertising which did not involve any controversial issue of public importance. The Commission held that this approach was unreasonable, and that the fairness doctrine was triggered by the commercials in issue.
 
 
 29
 Having decided that the fairness doctrine applied, the Commission then turned in Esso to the claim by the licensee that other programs carried by it were fully adequate to present the contrary side of the question. The Commission concluded that, on the basis of the information before it, it could not find that the programs cited by the licensee "afforded reasonable opportunity for the presentation of contrasting views to those presented in the commercials. * * *" The licensee was, accordingly, directed to submit within 10 days a statement indicating what additional material it had, or intended to, broadcast in order to satisfy its obligations under the fairness doctrine.
 
 
 30
 It is obvious that the Commission is faced with great difficulties in tracing a coherent pattern for the accommodation of product advertising to the fairness doctrine. It has said as much in the closing paragraphs of the Chevron decision, where it announced its purpose to initiate in the near future a wide ranging inquiry which "will permit a thorough re-examination and re-thinking of the broader issues suggested by this and other recent cases before us. * * *" We do not, of course, anticipate what the result of that proceeding will prove to be, nor do we minimize either the seriousness or the thorny nature of the problems to be explored therein. Pending, however, a reformulation of its position, we are unable to see how the Commission can plausibly differentiate the case presently before us from Banzhaf insofar as the applicability of the fairness doctrine is concerned.
 
 
 31
 It is true that fairness doctrine obligations can be met by public service programs which do give reasonable vent to points of view contrary to those reflected in the offending commercials. The Commission recognized this principle in the decision now under review, and noted that the licensee had listed programs carried by it as allegedly discharging this responsibility. The Commission, however, explicitly restricted the basis of its ruling to the inapplicability of the fairness doctrine; and it did not regard as being before it for decision the question of whether the licensee had otherwise met its fairness obligations. It indicated that this was a matter which was properly to be explored at license renewal time.
 
 
 32
 The fairness doctrine does not, of course, operate on that kind of a time schedule, as the Commission's most recent decision in the Esso case demonstrates. There, once the Commission found the fairness doctrine to be applicable, it directed its attention to the question of whether compliance had in effect been forthcoming by virtue of other programs aired by the licensee. Since the information before it on this point was scanty, the Commission was compelled to find the programs cited as falling short of an adequate presentation of contrasting views. It did, however, give the licensee an opportunity within 10 days to submit further information on this score.
 
 
 33
 The disposition we make here follows the Esso approach. Having found this case indistinguishable from Banzhaf in the reach of the fairness doctrine, and being without the benefit of an express finding by the Commission on the question of the possible satisfaction of that doctrine by the licensee through the medium of other programs, we remand the case to the Commission for determination by it of this second issue.[4]
 
 
 34
 It is so ordered.
 
 
 35
 WILBUR K. MILLER, Senior Circuit Judge, would affirm.
 
 
 
 [1]
 The individual petitioner is a resident of New York City who serves as executive director of Friends of the Earth, the other petitioner herein. The latter is a national organization dedicated to the protection and preservation of the environment. Its headquarters are in New York City
 
 
 [2]
 The origins and nature of the fairness doctrine are comprehensively described in Red Lion Broadcasting Co., Inc. v. FCC, 395 U.S. 367 (1969), especially at pp. 375-386, 89 S.Ct. 1794, 23 L.Ed.2d 371
 
 
 [3]
 Petitioners professed difficulty in seeing how "The World of the Beaver" and "The Great Barrier Reef" programs, cited by the licensee, had much relevance to the problem of the pollution of the air in New York City by automobiles
 
 
 [4]
 In Green v. FCC and G. I. Association v. FCC, - U.S.App.D.C. -, 447 F.2d 323 (decided June 18, 1971), this court left undisturbed the Commission's disallowance of a fairness doctrine complaint about military recruitment advertisements. There, however, the petitioners persisted in linking their complaints about the advertisements to the controversial issues of the Vietnam War and the draft; and the Commission found expressly that the licensees had not "failed to treat the issues of Vietnam and the draft (both concededly controversial issues of public importance) in conformance with the fairness doctrine."