**PUBLIC INTEREST RESEARCH GROUP and Environmental Law Institute, et al., Petitioners,**

**v.**

**FEDERAL COMMUNICATIONS COMMISSION et al., Respondents.**

**No. 74–1434.**

United States Court of Appeals, First Circuit.

Argued April 10, 1975.

Decided Aug. 18, 1975.

Thomas R. Asher, Washington, D. C., for petitioners.

John E. Ingle, Counsel, F.C.C., with whom Ashton R. Hardy, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, Jack David Smith, Jr., Washington, D. C., and Robert B. Nicholson, Atty., Dept. of Justice, were on brief, for respondents.

Ellen Shaw Agress, New York City, on brief for Environment Action Friends of the Earth, The Massachusetts Audubon Society, Environmental Policy Center, Council on Economic Priorities, Project on Corporate Responsibility, Center for Science in the Public Interest, Public Media Center, Action for Children's Television and National Citizens Committee for Broadcasting, amicus curiae.

Before McENTEE and CAMPBELL, Circuit Judges, TAURO, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

The question in this case is whether a Maine television station, having broadcast paid advertisements for snowmobiles, must air the viewpoints of those

---

* Sitting by designation.

who hold that snowmobiles are environmentally destructive, dangerous, noisy and offensive. The Federal Communications Commission, construing its recently revised fairness doctrine, has ruled not. *Peter B. Herbst,* 48 F.C.C.2d 614, *reconsideration denied,* 49 F.C.C.2d 411 (1974), stating that the ads were "standard product commercials" which were not devoted in an "obvious and meaningful way" to the discussion of public issues. We are asked to set aside that decision.[1]

On January 10, 1973, several viewers resident in Maine wrote to WMTW–TV, a local station. They protested Ski-Doo, Rupp, Alouette and Harley-Davidson ads that were being shown at prime viewing times. As they saw it, the ads presented,

> "basically one viewpoint regarding the sale and use of snowmobiles in Maine and greater New England: that snowmobile ownership and use is associated with the good life and should be encouraged, with individuals and families, without fear of one's own safety at high speeds, often over hilly terrain, and without any conscious consideration of wildlife, vegetation, ecological balance, noise, or safety of others on public lands, or private lands where snowmobile users are illegally trespassing."[2]

The letter spoke of testimony before a Senate subcommittee that the upsurge in snowmobile use threatened the environment, safety, property and wildlife, and caused vandalism and noise. In Maine, the letter pointed out, a controversy raged over proposals before the state legislature for regulation of snowmobile use, speed, noise and the like. Complainants charged that advertisements promoting "unrestricted product uses" did not refer to "other viewpoints on the product uses or of the problems involved." The snowmobile commercials presented "but one side of the important controversy."

Citing *Friends of the Earth v. FCC,* 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971) and *In re Wilderness Society,* 30 F.C.C.2d 643 (1971), *upon reconsideration,* 31 F.C.C.2d 729 (Sept. 23, 1971), the authors asserted that there was "a controversy in your service area regarding snowmobile use." This being so, the "fairness doctrine" was said to impose a duty upon WMTW to present other sides of the controversy (though not necessarily to grant equal time). Complainants suggested that the station air numerous spots at "strategic prime time" presenting all bona fide views on the snowmobile issue.

When WMTW did not respond promptly, the authors filed a formal complaint before the Federal Communications Commission. They elaborated upon the contention that snowmobiles were unsafe, and that injuries resulted from imprudence, alcohol, and driving in prohibited areas. Television ads were said to foster such excesses by encouraging "increased horse power and speeds and wide-open use over unknown and hilly terrain." Although the Maine legislature was studying limits on horsepower, speed and noise, the public, it was said, heard only one side. Meanwhile, the number of snowmobiles in Maine had increased from 54,000 in 1971 to 75,000 in 1973.

1. Our jurisdiction to review a final order of the Commission is set forth in 28 U.S.C. § 2342 and 47 U.S.C. § 402(a).

2. The text of the ads (which, as complainants remind us, does not convey the zooming noises and video images) contained language such as: "The new look of power . . . . Tested under conditions that would turn an ordinary machine into a spinning disaster." "Rugged and beautiful as the great outdoors." "Whisper jet." "We'll be riding high . . . . We're goin' to pass them by." "Could your snowmobile take punishment like this and them come back for more?" "See who runs quiet. See who packs the power." "Trail rides two people." "A power plant without equal." "The best in family fun. . . . On a Polaris winter is just one big fun-filled season." "It's a family affair." "New Ski-Doo quiet." "The only snowmobile in the country that meets the legal noise limit proposed for 1974. It's a giant step ahead of the law." "New safety" on "the machine that changed winter."

In addition to safety problems, snowmobiles were said to stir controversy over the extent of ecological harm (plantlife, some say, is biologically used to being undisturbed in winter), and over injury to property (snowmobiles are alleged to encourage wanton trespassing on the land of others). The Commission was asked to act with speed because the Maine legislature would be in session only briefly and public information was needed on all sides of the pending snowmobile legislation.

After the complaint was filed, WMTW answered that the fairness doctrine was not in issue, and that the ads did not advocate snowmobile misuse. Complainants promptly responded that the issue was not "misuse": "Whether 'misuse,' 'abuse,' 'proper use,' or any other term is used, these ads present only one side of a controversial issue of public importance. . . . " WMTW did offer to air, and aired, a single half-hour discussion program having to do with pending snowmobile regulatory legislation. However, complainants took the position that this one program could not offset five months of repeated and continuous ads.

The Commission's staff rejected the complaint. There followed review proceedings before the full Commission, during which, for the first time, the texts of the snowmobile ads were produced. The station asserted that they were conventional product ads. Complainants, on the other hand, maintained that they associated snowmobile use with "the good life" and encouraged a heady obliviousness of ecology, property rights and the public welfare.

The Commission eventually denied review of the staff report. By then the Commission had adopted and published its new fairness report, *Fairness Doctrine and Public Interest Standards,* 39 Fed.Reg. 26372, 48 F.C.C.2d 1 (1974),[3] after extensive inquiry into the fairness doctrine, ruling that standard product commercials which merely advocate the use of one product over another cannot be said to inform the public on any side of a controversial issue of public importance. The Commission stated that it would "apply the fairness doctrine only to those 'commercials' which are devoted in an obvious and meaningful way to the discussion of public issues." 39 Fed.Reg. at 26374, 48 F.C.C.2d at 26. Referring to that policy, the Commission in denying review in the instant case said that "hazardous operation, adverse environmental effects and interference with private property rights by snowmobilers may constitute controversial issues of public importance in the complainant's area. . . . "; still, the announcements in question were not devoted "in an obvious and meaningful way to the discussion" of those issues, hence snowmobile advertisements did not raise one side of a controversial issue of public importance.

I

▓▓▓ We deal initially with the suggestion of the Commission that, either under 28 U.S.C. § 2112(a) or under our inherent authority, we transfer the case to the District of Columbia Circuit for consolidation with *National Citizens Committee for Broadcasting v. FCC,* No. 74–1700. The latter proceeding, we are told, involves a broad review of the fairness report, including its product commercial policies. Given the desirability of uniform results and the special familiarity of the D.C. Circuit with communications problems, transfer seemed at first to be a plausible course. We accordingly invited supplemental briefing of the issue. Upon further consideration we are disinclined to transfer. The applicability of § 2112(a), as complainants point out, is far from clear, since the agency orders appealed from are altogether different. To be sure, the D.C. Circuit has jurisdiction to hear this case

---

**3.** This is described as a "broad-ranging inquiry into the efficacy of the fairness doctrine," the first in almost 22 years. Written comments were solicited and panel discussions held. The twin considerations of Commission policy were said to be to foster uninhibited, robust, wide-open debate on public issues, and to maintain and stimulate a commercially based broadcast system. 39 Fed.Reg. 26372, 48 F.C.C.2d 1 (1974).

under 47 U.S.C. § 402(b), and this court has equitable power to transfer cases to a proper forum if it would serve the interests of judicial economy or convenience to the parties. But we cannot be confident that the ends of justice would be served by a transfer since the agency record in *NCCB* has yet to be filed in the District of Columbia, and indeed the Commission is now reconsidering the case. We thus do not know to what extent the present case would fit in with that proceeding. We are unwilling to project the complainants, against their wills, into such an uncertain future, even assuming the D.C. Circuit would be willing to accept consolidation. Thus, without deciding the question of the applicability of 28 U.S.C. § 2112(a), we decline to transfer.

## II

■ When reviewing the substance of an agency decision, a court is limited to considering whether the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), and to measuring it against the twin external standards of statutory law and constitutional right, *id.* § 706(2)(B) and (C). We emphasize these standards at the outset, since this case turns as much or more upon observance of the respective functions of the court and agency as upon the merits of this interesting facet of the fairness doctrine controversy. *See generally* Ellman, *And now a Word Against Our Sponsor: Extending the FCC's Fairness Doctrine to Advertising,* 60 Cal.L.Rev. 1416 (1972).

We have no license to regulate broadcasting nor to impose our private views of the public welfare. What we must do is determine whether the Commission is acting within its lawful regulatory authority. In so doing, we shall first consider whether the Commission, judged in

terms of its own procedures and precedents, past and present, has acted rationally and properly. Thereafter, we shall consider its actions in terms of statutory and constitutional law.

We begin by summarizing part of the fairness report, *see* note 3 *supra,* which explains the Commission's current policy and its departure in certain respects from earlier policy. The portion of the report dealing with paid announcements begins by quoting the Commission's pronouncements made in 1929, 3 F.R.C.Ann. Rep. 32 (1929), to the effect that although broadcasters are licensed to serve the public and not the private or selfish interests of individuals or groups, advertising is an "apparent" exception because without it, broadcasting would not exist. From this, the report deduces that "any consideration of the applicability of the fairness doctrine to broadcast advertising must proceed with caution" so as not to undermine the economic base of the system. (Otherwise, the report generally endorses and continues in effect the fairness doctrine.) The report then distinguishes "Editorial Advertising" from "Advertisements for Commercial Products or Services." It holds that the fairness doctrine should apply to the former so long as the paid announcements present "a meaningful statement which obviously addresses, and advocates a point of view on, a controversial issue of public importance."[4] Turning to product advertisements, the report recognizes that many advertisements which do not look or sound like editorials are subject to fairness complaints because the business, product or service advertised is itself controversial. Reference is made to the Commission's "cigarette" ruling, *WCBS–TV,* 9 F.C.C.2d 921 (1967), *aff'd sub nom. Banzhaf v. FCC,* 132 U.S.App. D.C. 14, 405 F.2d 1082 (1968), *cert. denied sub nom. Tobacco Institute v. FCC,* 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93

---

**4.** This test is aimed at elucidating a broadcaster's duties when faced with institutional advertisements of a subliminal type which appear to discuss public issues but may not do so explicitly. 39 Fed.Reg. at 26380, 48 F.C.C.2d at 23; *cf.* National Broadcasting Co. (Wilderness So-

ciety—Esso), 30 F.C.C.2d 642, *upon reconsideration,* 31 F.C.C.2d 729 (1971). *See also* Jaffe, *The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access,* 85 Harv.L.Rev. 768, 777–78 (1972).

(1969), where the Commission held—very much as complainants would like it to hold here with respect to snowmobiles—that cigarette commercials inherently raised a health issue, defined in terms of the desirability of smoking. The report goes on to state,

"With the issue defined in this fashion, it was a simple mechanical procedure to 'trigger' the fairness doctrine . . . .. It seemed to be clear enough that *all* cigarette advertisements suggested that the use of the product was desirable.

. . . In retrospect, we believe that this mechanical approach to the fairness doctrine represented a serious departure from the doctrine's central purpose which, of course, is to facilitate 'the development of an *informed* public opinion' . . . .. We believe that standard product commercials, such as the old cigarette ads, make no meaningful contribution towards informing the public on any side of any issue."

Indeed, the report says, since the ads did not urge that cigarettes were good for health, a response that they were bad for health left the public with but one viewpoint.

The report went on to chronicle difficulties that arose when the D.C. Circuit refused to allow the Commission to treat the cigarette case as *sui generis.* In *Friends of the Earth v. FCC,* 146 U.S. App.D.C. 88, 449 F.2d 1164 (1971), the court, reversing the Commission, ruled that the fairness doctrine could not logically be restricted to cigarette advertising. Advertisements extolling high-powered cars were held to trigger fairness obligations also, even though the commercials did not discuss the product in terms of the air pollution controversy. The Commission saw itself and the broadcasters as having been forced to engage "in the trivial task" of balancing commercials which contribute "nothing to public understanding."

The upshot of the 1974 report is that the FCC cigarette decision is overruled as Commission precedent—on the grounds that without meaningful substantive discussion such as that found in "editorial advertisements" the usual product commercial cannot reasonably be said to inform the public on any side of a controversial issue of public importance, and that application of fairness doctrines to product ads "tends only to divert the attention of broadcasters from their public trustee responsibilities in aiding the development of an informed public opinion." Henceforth Commission policy will be to apply the fairness doctrine only to those commercials which "are devoted in an obvious and meaningful way to the discussion of public issues."

The present decision affecting snowmobiles conforms faithfully to the principles just summarized. It is true that it is open to the charge of nonconformity with two earlier agency precedents: the 1967 cigarette case and *Sam Morris,* 11 F.C.C. 197 (1946) (dealing with liquor advertisements in partially dry areas). It was on the basis of inconsistency with these rulings that the D.C. Circuit required a reluctant Commission to apply the fairness doctrine to commercials advertising other controversial products—most notably, large automobiles. *Friends of the Earth v. FCC, supra,* 449 F.2d 1164. But these cases all preceded the current fairness report and rested on the court's determination that the Commission was not applying its own precedents in an evenhanded way.[5] The Commission has now repudiated these precedents, has announced a policy which would allow no such exceptions, and has done so with appropriate notice and, we believe, sufficient clarity of analysis. *See Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026 (1971). We do not read *Friends of the Earth, supra,* or related cases decided in the D.C. Circuit

---

**5.** In *Friends of the Earth v. FCC,* 146 U.S.App. D.C. 88, 449 F.2d 1164, 1170 (1971), the court held that the Commission could not "plausibly differentiate the case presently before us" from the cigarette case "[p]ending . . . a reformulation of its position."

( *see Neckritz v. FCC,* 163 U.S.App.D.C. 409, 502 F.2d 411, 418 (1974)) as questioning the Commission's authority to shape a new course in this manner. In the absence of statutory or constitutional barriers, an agency may abandon earlier precedents and frame new policies. *See NLRB v. Weingarten, Inc.,* 420 U.S. 251, 264–66, 95 S.Ct. 959, 43 L.Ed.2d 171 (1974); *American Trucking Ass'n v. Atchison, T. & S. F. Ry.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967); *NLRB v. Wentworth Institute,* 515 F.2d 550 (1st Cir. 1975). Thus the decision's mere nonconformity with earlier agency precedent does not render it arbitrary and capricious.

■ Nor can we say that the decision reflects a policy which is so clearly irrational on its face as to be "arbitrary, capricious, an abuse of discretion." We distinguish between irrationality and the more complex questions, discussed below, of whether the decision is within the Commission's statutory and constitutional powers. Applying fairness standards to product commercial raises obvious problems of administration and policy that are open to more than one solution, and the Commission's present solution, whether right or wrong, was arrived at carefully and is in line with the recommendations of commentators who have studied the problem. H. Geller, The Fairness Doctrine in Broadcasting (1973); Jaffe, *The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access,* 85 Harv.L.Rev. 768, 771–80 (1972). Unless the standard of rationality is to be narrowed to a circle no wider than a court's private judgments, we cannot rule that the Commission's policies here are "arbitrary, capricious, an abuse of discretion" within the meaning of section 706(2)(A).

We turn next to whether the Commission's exclusion of product commercials which are not facially controversial from fairness obligations is within its statutory authority. The fairness doctrine is not a creature of statute but was evolved over the years by the Commission under the "public interest" standard of the Communications Act. Thus complainants are able to point to little in the way of relevant legislation. Complainants argue that Congress, largely by acquiescence, has "codified" both the fairness doctrine and the Commission's former application of it to product ads. They contend that the fairness doctrine now applies to *all* controversial issues, and that since snowmobiles are controversial—especially when advertised at a time when their regulation was being debated in the Maine legislature—the agency acted illegally in declining to apply the doctrine.

■ But this argument assumes a degree of legislative specificity which simply does not exist. While Congress has been said to have acknowledged and generally endorsed the Commission's adoption of fairness standards, it has legislated only once on any aspect of the doctrine, and then in an area totally divorced from the thorny issue of product commercials. *See* 47 U.S.C. § 315 (equal time doctrine applying to political candidates). In *Red Lion Broadcasting v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court upheld the constitutionality of the fairness doctrine as applied by the Commission to broadcasts involving personal and political criticism; and, in so doing, the Court pointed to evidence that, in amending section 315 of the Communications Act of 1934, Congress had approved the general tenets of the fairness doctrine. But it is a long step from *Red Lion* and the 1959 legislative statements cited therein, to a holding that the Commission is bound to interpret product commercials not explicitly discussing public issues as generating controversy to which fairness obligations attach. As the aftermath of the cigarette case suggests, there may be no practical stopping place if this approach is accepted; the court in *Friends of the Earth, supra,* foreclosed the luxury of a halfway approach. (Thus in the present case, if the Commission were to be impressed with the public importance of the snowmobile issue, it could now rule for complainants

only at the cost of reopening what might seem like a pandora's box.) Given the necessity of product advertising in American broadcasting, and the administrative difficulties and costs of determining when a product is so controversial as to trigger fairness obligations, we cannot, merely from the generalized congressional endorsements described in *Red Lion,* say that the Commission acted contrary to statute when it struck the current balance between product advertising and the fairness doctrine. We think Congress left questions of application and accommodation to the Commission under the general public interest standard; the Commission's present ruling is not so plainly inimical to the public interest as to be illegal.

In *Columbia Broadcasting System, Inc. v. Democratic National Comm.,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1972), Chief Justice Burger referred to the balancing of public and private interests in broadcasting as a "tightrope." He pointed to the established principle that the construction of a statute by the agency charged with executing it is entitled to deference, and stated on the related question of media access,

"Congress has chosen to leave such questions [as media access] with the Commission, to which it has given the flexibility to experiment with new ideas as changing conditions require. . . ."

*Id.* at 122, 93 S.Ct. at 2096. Moreover, it is perfectly obvious from the extent of the disagreement in *CBS* as well as from recent decisions on the fairness doctrine that there are difficult problems with how and when it should be applied. Under such circumstances, there is particular reason to defer to the agency established to exercise supervision. As Chief Judge Bazelon has written,

"I think there is a proper role for Commission 'expertise' or experience

in the administration of the treacherous problems of determining what issues are raised by a broadcast and whether [these] issues are 'controversial.' The FCC has by now had 40 years of experience in dealing with telecommunications broadcasts . . . ."

*National Broadcasting Sys. v. FCC,* 516 F.2d 1101 (D.C.Cir.1975) (dissenting). We conclude that the Commission's current policy is within its statutory authority.

There is finally the question whether the Commission's policy violates the first amendment. Complainants argue that the fairness doctrine serves the first amendment by requiring airwave licensees to be true public forums for the presentation of divergent views. The essence of this argument seems to be that the first amendment requires the fairness doctrine either to be enforced to the hilt or to be supplemented by regulations designed to ensure access to the broadcasting media by all points of view. *Cf. CBS, supra,* 412 U.S. at 185–90, 93 S.Ct. 2080 (Brennan, J., dissenting).

 This approach does not seem to us to have commanded a majority of the Court (although, to be sure, *CBS* involved issues of access rather than fairness). Furthermore, we have doubts as to the wisdom of mandating, rather than merely allowing, government intervention in the programming and advertising decisions of private broadcasters. It is certainly possible to argue, as complainants suggest here, that "[the] uninhibited marketplace of ideas in which truth will ultimately prevail," *see Red Lion, supra,* 395 U.S. at 390, 89 S.Ct. at 1806, might be better served by a continued extension of the fairness doctrine to product advertising. But we do not view that question, in the short and long run, as so free from doubt that courts should impose an inflexible response as a matter of constitutional law.[6] We be-

---

6. The majority in *Columbia Broadcasting Sys., Inc. v. Democratic Nat'l Comm.,* 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1972) has been characterized as having:

"a deeply felt belief that the broadcasting system presents a special situation to which traditional constitutional doctrines should not be mechanically applied. Underlying

lieve the first amendment permitted the Commission not only to experiment with full-scale application of the fairness doctrine to advertising but also to retreat from its experiment when it determined from experience that the extension was unworkable. In any event, at present we cannot say that the first amendment requires the Commission to force the presentation of alternate views in response to product advertisements which do not explicitly expound a point of view on a public issue.

Complainants further see a constitutional violation in differentiating commercials, unreasonably it is said, from all other forms of speech. But as we have previously said, the Commission's reasons for differentiation, which are explained in the fairness report, can hardly be termed irrational, whatever one's views as to their soundness. Furthermore, we see no vagueness in the new standards. They are, in fact, remarkably clear when compared with the distinctions that would have to be made were fairness standards to apply to product commercials generally.

Finally, the decision is challenged under section 101(b) of the National Environmental Policy Act, 42 U.S.C. § 4331(b), which states the congressional policy that the Government use "all practicable means, consistent with other essential considerations of national policy," to protect and promote environmental quality. We hesitate to read this section of NEPA as imposing requirements upon the Commission's regulatory and licensing functions in the areas of program content and speech. Given the prohibition in section 326 of the Communications Act against Commission censorship, we do not believe that section 101(b) of NEPA can be interpreted to compel the Commission to

use its licensing power as a lever to impose special standards upon private licensees in the interest of the environment. *Cf. United States v. SCRAP*, 412 U.S. 669, 694–95, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

*Affirmed.*

this belief is a concern that the delicate interest balancing and complex administrative demands inherent in government regulation of broadcasting require that the public interest be entrusted to an expert agency equipped with broad discretion enabling it to

develop flexible solutions unburdened by rigid constitutional standards."
*The Supreme Court, 1972 Term,* 87 Harv.L. Rev. 178 (1973); *Cf. Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1973).