NATIONAL CITIZENS COMMITTEE FOR BROADCASTING and Friends of the Earth, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

American Broadcasting Companies, Inc. (ABC), CBS, Inc., Intervenors.

COMMITTEE FOR OPEN MEDIA, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,

Council on Economic Priorities and United Farm Workers of America and Henry Geller, Intervenors.

COUNCIL ON ECONOMIC PRIORITIES, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,

United Farm Workers of America, Intervenor.

Nos. 74-1700, 76-1351 and 76-1360.

United States Court of Appeals, District of Columbia Circuit.

Argued April 29, 1977.
Decided Nov. 11, 1977.

Tracy Westen, Washington, D.C., with whom Geoffrey Cowan, Los Angeles, Cal., was on the brief, for petitioners in No. 74–1700.

Charles M. Firestone, Washington, D.C., with whom Frank W. Lloyd, III, Washington, D.C., was on the brief, for petitioner in No. 76–1351.

Harvey J. Shulman and Collot Guerard, Washington, D.C., with whom Carol J. Jennings, Washington, D.C., was on the brief, for petitioner in No. 76–1360 and intervenors, Council on Economic Priorities and United Farm Workers of America, AFL–CIO in No. 76–1351.

C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., with whom Werner K. Hartenberger, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., and Robert B. Nicholson, Atty., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Ashton R. Hardy, Gen. Counsel, F.C.C., Washington, D.C., at the time the record was filed, entered an appearance for respondent F.C.C. Joseph A. Marino, and John E. Ingle, and Stephen A. Sharp, Counsel, F.C.C., Washington, D.C., also entered appearances for respondent F.C.C. Carl D. Lawson and Barry Grossman, Attys., Dept. of Justice, Washington, D.C., entered appearances for respondent United States of America.

Joel Rosenbloom, Washington, D.C., with whom J. Roger Wollenberg, Stephen A. Weiswasser, Michael S. Schooler, and Donald C. Langevoort, Washington, D.C., were on the brief, for intervenor CBS, Inc. in No. 74–1700 also argued for intervenor American Broadcasting Companies, Inc.

Henry Geller, Washington, D.C., for intervenor, Henry Geller in No. 76–1351.

James A. McKenna, Jr. and Carl R. Ramey, Washington, D.C., were on the brief for intervenor, American Broadcasting Companies, Inc. in No. 74–1700.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

Opinion for the Court filed by McGOWAN, Circuit Judge.

McGOWAN, Circuit Judge:

These three consolidated petitions for review challenge various aspects of the Federal Communications Commission's *Fairness Report*. That *Report* was the product of an inquiry by the FCC, extending five years from its initiation in 1971, the issuance of the *Report* in 1974, and the denial of reconsideration in 1976, into the policies underlying the fairness doctrine and their implementation. It was the first such sustained review since the doctrine was originally articulated by the Commission nearly thirty years ago; and it was a proceeding in which written comments were received from over 120 persons or organizations, with eighty participants in a week-long series of panel discussions and oral arguments held by the FCC in 1972.

For the reasons hereinafter appearing, we leave undisturbed the *Report* itself, including its central determination to withhold application of the fairness doctrine to broadcast communications promoting the sale of commercial products. Our remand to the FCC, however, is with directions to pursue further inquiry into two of the alternative courses of action proposed by some of the petitioners as ways by which the general objectives giving rise to the fairness doctrine can be realized.

I

The fairness doctrine, which is not identified in terms in the statutes administered by the FCC, had its inception in 1949.[1] The Notice of Inquiry initiating the reexamination, 30 F.C.C.2d 26 (1971), stated that the ensuing investigation would center around four major topics:

1. The fairness doctrine generally;
2. Application of the fairness doctrine to broadcast of paid announcements;

---

1. Report on Editorializing by Broadcast Licensees, 13 F.C.C. 1246 (1949).

3. Access to broadcast media for discussion of public issues; and

4. Application of the fairness doctrine to political broadcasts.

The issues considered on this appeal relate to all but the last of these topics, which was the subject of a separate report issued in 1972.[2]

In No. 74–1700, petitioners National Citizens Committee for Broadcasting (NCCB) and Friends of the Earth, and petitioner Council of Economic Priorities (CEP), in No. 76–1360, object to the decision in the *Fairness Report* not to apply the fairness doctrine to ordinary product advertisements, and further contend that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* (1970 & Supp. V 1975), requires the Commission to apply the fairness doctrine to advertisements for environmentally dangerous products.[3]

In No. 76–1351, petitioner Committee for Open Media (COM) challenges the Commission's failure, on reconsideration of the *Fairness Report,* to adopt, or order further inquiry into, its access proposal as an alternative to current fairness doctrine enforce-

ment. Also in No. 76–1351, intervenor Henry Geller challenges the Commission's decisions to continue case-by-case consideration of fairness doctrine complaints, and its failure to consider and adopt his "10-issue" proposal relating to the fairness doctrine requirement that a broadcaster devote a reasonable amount of time to coverage of public issues.[4]

Because the fairness doctrine and its application have been the subject of extensive commentary in prior decisions of both this court[5] and the Supreme Court,[6] we do not consider it necessary in this opinion to delve into these matters beyond the extent to which they directly impinge on the issues now before us. Similarly, we shall not comment upon those parts of the *Fairness Report* and order denying reconsideration which are not challenged on these appeals except to the extent they cannot be disentangled from the particular questions we confront.

Accordingly, we shall first consider, in Part II hereof, the challenges to the Commission's decisions with respect to the reach of the fairness doctrine. Part III of the opinion will address the specific contentions

---

2. First Report—Handling of Political Broadcasts, 36 F.C.C.2d 40 (1972) (concerning application of the fairness doctrine to appearances by candidates and public officials).

The *Fairness Report* itself appears as The Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 48 F.C.C.2d 1 (1974). The FCC response to the requests for reconsideration is to be found in Memorandum Opinion and Order on Reconsideration of the Fairness Report, 58 F.C.C.2d 691 (1976) [*Reconsideration Order*]. Part V of the *Report* itself (at 31–33) deals with application of the fairness doctrine to ballot propositions—a matter which is not in issue here.

3. Petitioner NCCB further urges that the FCC should have undertaken an Environmental Impact Statement before issuing the *Fairness Report.* NCCB argues that removal of product advertising from fairness doctrine application will result in more ads for environmentally dangerous products, more use of such products, and therefore more harm to the environment. We do not think that Congress intended to require preparation of an EIS dealing with such remote and speculative possibilities. *See Natu-*

*ral Resources Defense Council, Inc. v. Morton,* 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).

4. In addition to petitioners and respondents Federal Communications Commission and United States of America and intervenors referred to above, additional intervenors in these cases are American Broadcasting Companies, Inc.; Columbia Broadcasting System, Inc.; and United Farm Workers of America, AFL–CIO. Each of these organizations participated in the FCC's fairness doctrine inquiry.

5. *National Broadcasting Co. v. FCC,* 170 U.S.App.D.C. 173, 516 F.2d 1101 (1974) [*Pensions*], vacated as moot, *id.,* 170 U.S.App.D.C. at 252, 516 F.2d at 1180 (1975), *cert. denied,* 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976); *Democratic National Committee v. FCC,* 148 U.S.App.D.C. 383, 460 F.2d 891, *cert. denied,* 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972); *Healey v. FCC,* 148 U.S.App.D.C. 409, 460 F.2d 917 (1972); *Green v. FCC,* 144 U.S.App.D.C. 353, 447 F.2d 323 (1971).

6. *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 375–86, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

concerning the manner of enforcement of the fairness doctrine.

## II

■ The *Fairness Report* concludes that the fairness doctrine should not be applied to broadcast advertisements promoting the sale of a commercial product. This decision was made with a conscious awareness that it represents a marked shift from previous FCC policy. That previous policy, which was developed in a series of *ad hoc* decisions by the Commission and the courts, was never subject to precise articulation or definition, leading to uncertainty and difficulties in achieving full and fair enforcement. While we are under no illusion that the new policy, described more fully below, will solve all or perhaps even most of the implementation problems encountered heretofore, we believe that we are without warrant to deny the Commission the opportunity to attempt a new resolution of those difficulties provided that its action is consistent with constitutional and statutory commands and is otherwise in accordance with standards governing such an exercise of agency discretion. Our function in reviewing the validity of the Commission's decision to reverse its previous course of action is to ensure that it has

provide[d] an opinion or analysis indicating that the [previous] standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law.[7]

This standard is a distillation of the general criteria governing judicial review of an exercise of agency discretion in the context of

informal rulemaking such as that before us. Our

responsibility is to assure that the agency has not abused or exceeded its authority, that every essential element of the order is supported by substantial evidence, and that the agency has given reasoned consideration to the pertinent factors.[8]

### A. Background

■ The basic principles of the fairness doctrine were established long before the doctrine was given a label: broadcast licensees are obliged both to cover controversial issues of public importance and to broadcast opposing points of view on them.[9] The Commission and petitioners disagree as to when it became FCC policy to apply these obligations to ordinary commercial advertising. In a decision rendered in 1946, the Commission noted that fairness principles could be applicable to product advertisements if the latter involved controversial public issues.[10] The FCC's first comprehensive statement of the fairness doctrine in 1949 did not mention its applicability to product commercials, although the statement did refer approvingly to the FCC's 1946 decision.[11]

■ Whether or not these statements nearly three decades ago can be said to have established a policy of subjecting commercial advertisements to fairness requirements, it is undeniable that any such policy lay practically dormant until 1967.[12] In that year the Commission held in *WCBS–TV*, 8 F.C.C.2d 381, *upon reconsideration*, 9 F.C.C.2d 921, that cigarette commercials

7. *Columbia Broadcasting System, Inc. v. FCC,* 147 U.S.App.D.C. 175, 183, 454 F.2d 1018, 1026 (1971).

8. *Pensions, supra* note 5, 170 U.S.App.D.C. at 194, 516 F.2d at 1122.

9. *See, e. g., Great Lakes Broadcasting Co.,* 3 F.R.C.App.Rev. 32 (1929) ("Public interest requires ample play for . . . opposing views . . . [on] discussions and issues of importance to the public"), *rev'd on other grounds,* 59 App.D.C. 197, 37 F.2d 993, *cert. dismissed,* 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1930).

10. *Sam Morris,* 11 F.C.C. 197 (1946).

11. *Report on Editorializing, supra* note 1, at 1249–50 ("duty [to ensure dissemination of news and ideas] extends to all subjects of substantial importance to the community").

12. In 1963 the Commission had advised broadcasters that a "paid announcement" could be subject to fairness doctrine obligations. Controversial Issue Programming, 40 F.C.C. 571, 572 (1963).

raised the controversial and publicly important issue of whether smoking is desirable, and thus gave rise to the second obligation of the fairness doctrine.[13] In *Banzhaf v. FCC* this court affirmed the Commission's authority to apply the fairness doctrine to cigarette advertisements.[14] In so doing, we recognized the unique danger to health posed by cigarettes but did not in terms foreclose the possibility that the Commission would be obliged to follow the cigarette precedent with respect to other product advertisements raising controversial issues of public importance.

In *Friends of The Earth v. FCC*, 146 U.S.App.D.C. 88, 449 F.2d 1164 (1971), we held that, under the approach taken by the Commission with respect to cigarettes in *Banzhaf*, advertisements for high powered automobiles and leaded gasoline also gave rise to the fairness obligation to broadcast opposing points of view. Just as cigarette advertisements were thought to have raised the issue of the desirability of smoking, so also the advertisements at issue in *Friends of the Earth* posed the question of the desirability of motorist preferences which increased air pollution. Moreover, as had

been true in the cigarette controversy, there existed uncontroverted evidence of the hazards to health caused by air pollution; and this was unquestionably a controversial issue of public importance. We thus found it impossible to ignore the analogy between the *Banzhaf* cigarette advertisements and the advertisements for cars and gasoline challenged in *Friends of the Earth*; and held that the FCC was obliged to follow the cigarette advertising precedent until and unless the Commission reformulated the policy that it had articulated in *WCBS–TV*.[15]

> We noted in *Friends of the Earth* that [i]t is obvious that the Commission is faced with great difficulties in tracing a coherent pattern for the accommodation of product advertising to the fairness doctrine.

146 U.S.App.D.C. at 94, 449 F.2d at 1170. This may, if anything, have understated the problem. Once the Commission determined in *WCBS–TV* that implicit advocacy gave rise to the fairness doctrine obligation to broadcast opposing points of view, it inevitably became necessary to draw a line between messages so opaque that it could not

---

**13.** Throughout the history of fairness doctrine enforcement, much more attention has been given to this second obligation—the provision of opposing points of view on controversial issues about which only one viewpoint has been broadcast—than to the first, namely, the affirmative obligation to provide coverage of controversial and important issues. FCC has only once sustained a complaint relating to the part one obligation. *Patsy Mink*, 59 F.C.C.2d 987 (1976).

It is also clear that issues giving rise to the part two obligation would not necessarily be required to be covered under the first obligation; the threshold which triggers the second fairness obligation is lower than that which triggers the first. *See Public Communications, Inc.*, 49 F.C.C.2d 27, *application for review denied*, 50 F.C.C.2d 395, 399–400 (1974). Certainly all parties in this case recognize this asymmetry with respect to product commercials. To our knowledge it was never suggested during the inquiry into operation of the fairness doctrine that broadcasters be affirmatively obligated to present views advocating use of controversial products. *Cf. Cigarette Advertising and Anti-Smoking Presentations*, 27 F.C.C.2d 453 (1970), *aff'd sub nom. Larus & Bros. Co. v. FCC*, 447 F.2d 876 (4th Cir. 1971)

(broadcast of anti-smoking messages does not give rise to fairness doctrine obligation to broadcast views advocating smoking because the issue is no longer a matter of public controversy).

**14.** 132 U.S.App.D.C. 14, 405 F.2d 1082 (1968), *cert. denied sub nom. Tobacco Institute v. FCC*, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969).

**15.** 146 U.S.App.D.C. at 93–95, 449 F.2d at 1169–71. Prior to *Friends of the Earth*, in *Retail Store Employees Union, Local 880, R.C.I.A. v. FCC*, 141 U.S.App.D.C. 94, 436 F.2d 248 (1970), this court determined that product advertising by a department store which was being boycotted as a result of a labor dispute implicitly raised the issue of whether or not the store should be patronized, which, given the union strike and boycott, was a controversial issue of substantial public importance. *Id.*, 141 U.S.App.D.C. at 104, at 258. As was true in *Banzhaf* and *Friends of the Earth*, decided subsequently, the advertisements in *Retail Store Employees Union* did not discuss or even allude to an important issue in controversy. Yet in all three of these cases viewers or listeners were subjected to implicit advocacy of one side of such an issue.

fairly be said a controversial issue was adumbrated, and messages which have the clear effect of advocacy, albeit in a subtle and nonexplicit manner.

In *Neckritz v. FCC*, 163 U.S.App.D.C. 409, 502 F.2d 411 (1974), this court refused to find that an advertisement for a gasoline additive purportedly helpful in reducing automobile emissions raised the controversial issue of auto pollution. Under the approach taken in *Banzhaf* and *Friends of the Earth*, the court could have reached a different conclusion under the following chain of reasoning: 1) the gasoline additive can be used only in conjunction with gasoline, and, indeed, the challenged advertisements promoted the sale of gasoline with the additive; 2) advocating the use of gasoline raises the desirability of such use; 3) gasoline use causes air pollution,[16] which is a controversial issue of public importance; 4) thus, the advertisements raised a controversial issue of public importance. An advertisement with the theme of reducing air pollution would have been held to give rise to the fairness obligation to present the point of view that the product promoted would not reduce air pollution.

This is different from the situations in *Banzhaf, Retail Store Employees Union,* and *Friends of the Earth*, where the advertisements implicitly took a position on the ultimate public issue, rather than a position on ways to solve the ultimate matter in controversy. The court in *Neckritz* thus limited the reach of the approach stated in *Banzhaf* for application of the fairness doctrine to product commercials: debate over the *efficacy* of a product in solving an issue of public concern does not raise that issue.

The basic policy choice underlying the *Neckritz* holding is that the fairness doctrine should not be transformed into a vehicle for correction of allegedly false advertising.[17] However, it is understandable that some confusion was caused by the holding in *Neckritz*, on the one hand, that a commercial explicitly mentioning a matter of public concern does *not* give rise to fairness obligations, and the holding in *Friends of the Earth*, on the other, that a commercial only implicitly raising that same issue *does* give rise to fairness obligations.[18]

The difficulty of defining issues "implicitly" raised by product promotions is only one source of the confusion which resulted from the decision in *WCBS–TV* to apply the fairness doctrine to commercial advertisements. It has also proven difficult to apply the fairness doctrine to advertisements which do not directly promote a product. Thus, in *Green v. FCC* this court affirmed the FCC conclusion, 24 F.C.C.2d 171 (1970), that armed forces recruitment messages did not raise the issues of the military draft and the Vietnam war, which at the time were significant and controversial issues.[19] While we admitted that the issue of *voluntary* military recruitment was "implicit" in the challenged announcements, we were not prepared to conclude that the broader issue of the desirability of military service generally was thereby also raised.[20]

On the other hand, this court expressed agreement with the Commission's decision in *National Broadcasting*, 30 F.C.C.2d 643 (1971), that advertisements by Esso advocating oil exploration and drilling in Alaska raised the then-controversial issue of whether the Alaska pipeline should be built,

**16.** Petitioners argued that since the advertised additive was found only in leaded gasoline, the advertisements were in effect for leaded gasoline, which contributes more to auto pollution than does nonleaded gasoline.

**17.** 163 U.S.App.D.C. at 416, 502 F.2d at 418. The court stated that charges of false advertising are a proper subject of investigation by the Federal Trade Commission. *Id.*

**18.** *See* Simmons, Commercial Advertising and the Fairness Doctrine: The New F.C.C. Policy

in Perspective, 75 Colum.L.Rev. 1083, 1094 (1975).

**19.** 144 U.S.App.D.C. 353, 447 F.2d 323 (1971).

**20.** *Id.*, 144 U.S.App.D.C. at 359–362, 447 F.2d at 329–332. The court also held that even if the issues of the draft, the Vietnam war, and the desirability of military service were raised sufficiently for application of the fairness doctrine, these fairness obligations were met by adequate and complete coverage of these issues. *Id.*

even though the advertisements under challenge did not refer to this issue or state explicitly that the pipeline should be built.[21]

Both *Green* and *National Broadcasting* involved a type of advertisement close to what has been called "institutional advertising"—that is "advertising that promotes the overall image of its sponsor and [only] indirectly its product."[22] In at least one important respect, it is even more difficult to articulate a workable standard for what constitutes an issue "implicitly raised" in the institutional advertising context than it is in the context of advertisements promoting a product or service, such as those in *Banzhaf, Retail Store Employees Union,* and *Friends of the Earth.* The latter *explicitly* advocate patronizing a product. In most cases, only one clear inference need be drawn in order to state the issue implicitly raised: the *desirability* of engaging in such purchases. Where the advertisement at issue merely presents the sponsor, or certain of its activities, in a favorable light, it could be concluded that every issue affecting the viability of the enterprise promoted is thereby "implicitly" raised.[23] The Commis-

sion refused to take such an approach with respect to institutional advertising,[24] but, as was true with respect to ordinary product commercials, neither the Commission nor the courts were able to articulate clear criteria for ascertaining which issues are and are not "implicitly" raised by institutional advertisements.

### B. *New FCC Policy with Respect to Commercial Advertisements*

The failure of either the courts or the Commission to delineate clearly in the foregoing decisions the contours of the *Banzhaf* approach to commercial advertising and the fairness doctrine may be ascribed in part to the very proceeding now under review.[25] Aware that a thorough inquiry into the fairness doctrine was pending, neither the agency conducting that inquiry[26] nor the courts[27] reviewing agency execution of current fairness doctrine policy were eager to use specific fairness complaints as a vehicle for comprehensive analysis of the efficacy and contours of the *Banzhaf* approach.[28]

The *Report* divides advertisements into three general categories: editorial adver-

---

**21.** *See Friends of the Earth, supra,* 146 U.S. App.D.C. at 94, 449 F.2d at 1170 (1971).

**22.** *See* Simmons, *supra* note 18, at 1089.

**23.** *See also Media Access Project,* 44 F.C.C.2d 755 (1973), where the Commission held that advertisements contending that the sponsor power company needed to expand its operations raised the issue of whether a pending request for a rate increase should be granted. One of these advertisements did *explicitly* advocate the desirability of "[a]n increase in price." *Id.* at 765 (Appendix I).

**24.** *See, e. g., Anthony R. Martin—Trigona,* 19 F.C.C.2d 620, 622 (1969) (institutional advertising by network and "praise of commercial television . . . cannot be regarded as clear criticism of pay television" and thus do not raise the pay television controversy).

**25.** In *Green, supra,* 144 U.S.App.D.C. at 363, 447 F.2d at 333 n. 19, this court stated that the pending fairness inquiry "should provide a helpful and much-needed illumination of the commercial advertising aspects of the fairness doctrine."

**26.** *Cf. Neckritz,* 29 F.C.C.2d 807, 814 (1971) (Commission announced plan to undertake "thorough re-examination and rethinking" of

broad issues relating to fairness doctrine and commercial advertising).

**27.** *See Green, supra,* 144 U.S.App.D.C. at 363, 447 F.2d [333] at 333 & n. 19 ("Other cases . . . will provide the appropriate occasions for critically tracing the contours of the public interest standard as it applies to commercial advertising," citing, *inter alia,* the Commission's plans to undertake thorough inquiry into fairness doctrine); *Friends of the Earth, supra,* 146 U.S.App.D.C. at 94, 449 F.2d at 1170 (noting pending fairness doctrine inquiry); *Neckritz,* 163 U.S.App.D.C. at 417, 502 F.2d at 419 (Bazelon, J., voting to deny application for rehearing *en banc* in part because review of recently issued *Fairness Report* was then being sought).

**28.** Thus, our general approval in this opinion of the decisions reached in the *Fairness Report* with respect to the applicability of the fairness doctrine to commercial advertisements should not be interpreted as expressing the view that an accommodation of fairness doctrine requirements with commercial advertisements consistent with the *Banzhaf* approach was not possible.

tisements; standard product commercials; and advertisements making product efficacy claims about which there is dispute. Henceforth, only those advertisements in the first of these categories will give rise to fairness doctrine obligations. While petitioners raise objection only to the *Report's* treatment of standard product commercials, we believe that, to be adequately analyzed and understood, this portion of the *Report* must be considered in the context of FCC policy generally concerning application of the fairness doctrine to advertisements. Therefore, we shall briefly examine the *Report's* conclusions with respect to each of the categories of advertisements listed above.

Editorial advertisements consist of "direct and substantial commentary" on controversial issues of public importance. *Fairness Report* at 22. The classic example of such an announcement is an "overt" editorial, *id.* at 22, referred to at another point in the *Report* as an advertisement "that explicitly raise[s] [a] controversial issue," *id.* at 26.[29] However, the *Report* recognizes that certain advertisements which do not *explicitly* or *overtly* discuss a controversial issue nevertheless should be considered editorial advertisements because they present "a meaningful statement which obviously addresses, and advocates a point of view on," controversial issues of public importance, *id.* at 23.

The *Report* concludes that one type of announcement which may give rise to fairness doctrine obligations even though it is not an overt editorial is institutional advertising "designed to present a favorable public image of a particular corporation or industry rather than to sell a product." *Id.* Although institutional advertising "ordinarily does not involve debate on public issues," if the advertiser "seek[s] to play an obvious and meaningful role in public debate[,] . . . the fairness doctrine . . . applies." *Id.*[30] The Commission has attempted to provide some guidance for determining whether fairness doctrine obligations apply to advertisements that are not "explicitly controversial."[31] Licensees are advised that when the relationship of an advertisement to ongoing debate in the community is substantial and obvious the ad is likely to represent "obvious participation in public debate."[32] In such circumstances, the fairness doctrine should be applied. *Id.* at 23–24.

We interpret the foregoing pronouncements concerning overt editorials and institutional advertising as reaffirmations of previous FCC policy in these areas. That portion of the *Report* dealing with standard product commercials, on the other hand, is an explicit departure from previous policy. The *Report* announces that advertisements for commercial products or services, such as the cigarette advertisements in *Banzhaf* and the automobile and gasoline advertisements in *Friends of the Earth*, henceforth will not give rise to fairness obligations

---

**29.** "An example of an overt editorial advertisement would be a thirty—or sixty—second announcement prepared and sponsored by an organization opposed to abortion which urges a constitutional amendment to override a decision of the Supreme Court legalizing abortions under certain circumstances." *Fairness Report* at 22.

**30.** The quoted phrase suggests that the advertiser's subjective intention is determinative of whether the commercial is an "editorial advertisement." However, the Commission at another point in the *Report* states it is not concerned with "the advertiser's actual intentions" in running an ad, but rather in whether the ad as presented "is an obvious participation in public debate." *Fairness Report* at 23.

**31.** In view of the difficulty inherent in making this judgment, the Commission expressed its intention to allow licensees considerable leeway in deciding whether the advertisement at issue incurs fairness obligations. The Commission will uphold the licensee's decision not to broadcast opposing points of view

> unless the facts are so clear that the only reasonable conclusion would be to view the "advertisement" as a presentation of one side of a specific public issue.

*Id.* at 24.

**32.** The *Report* gives as an example an advertisement in which the arguments and views presented "closely parallel" the position of advocates on either side of a public issue, and cites *Media Access Project,* discussed at note 23 *supra. Id.*

because they "make no meaningful contribution to informing the public on any side of any issue," even though "the business, product, or service advertised is itself controversial." *Fairness Report* at 24. The Commission thus explicitly rejects the chain of reasoning first enunciated in *WCBS–TV*: that because promoting a product raises the issue of the desirability of its use, such promotion triggers application of the fairness doctrine if use of the product is a controversial issue of public importance.

Under the policy announced in the *Fairness Report*, promotion of controversial products will not require presentation of points of view opposing use or sale of the products. This does not mean that all product advertisements are exempt from fairness obligations, however. If in the course of promotion of a product there is "obvious and meaningful . . . discussion" on one side of a controversial issue impinging on the desirability of the product, fairness obligations attach because such advocacy qualifies as an editorial advertisement. *See id.* at 26.

The third and final category of advertisements discussed in the *Fairness Report* are product claims alleged to be false or misleading, such as the claims for a gasoline additive at issue in *Neckritz*, discussed above.[33] The *Report* essentially takes the position enunciated by this court in that case. In refusing to apply the fairness doctrine to those claims, the court in *Neckritz* distinguished between raising the issue of the effect of a product on a problem which is a controversial issue of public importance and directly raising the controversial issue itself. The opinion went on to suggest that

a Federal Trade Commission action for false advertising was the appropriate way to resolve disputes over the truthfulness of efficacy claims.[34] Likewise, the *Report* concludes that product efficacy claims "play no meaningful or significant role in the debate of controversial issues," *Fairness Report* at 28. Under the policy announced in the *Report*, the FCC will forego application of the fairness doctrine to product claims, however controversial those claims may be and however controversial the public issue to which they relate. The *Report* concludes that there exists an alternative and preferable "congressionally-mandated remedy for deceptive advertising . . . in the form of various FTC sanctions." *Id.* at 27–28.

## C. *Constitutionality of the New FCC Policy*

As already mentioned, petitioners and intervenors in this case have not made specific objections to those portions of the *Fairness Report* that, in effect, reaffirm previous policy with respect to editorial advertisements and product efficacy claims. Nor does this court find any cause to upset these portions of the *Report*, which seem to us well reasoned and fully consistent with constitutional and statutory commands.

■■■ The *Report's* treatment of commercial advertising is vigorously challenged on both statutory and constitutional grounds. We believe that the challenges invoking the first amendment are based on a fundamental misunderstanding of the relationship between constitutional protection of commercial, or any other type of, speech and the functioning of the fairness doctrine.[35] As best we can determine, petition-

---

**33.** The *Fairness Report* has separate subsections dealing with editorial advertisements and standard product commercials. The application of the fairness doctrine to product efficacy disputes, however, is discussed in the course of the Commission's response to a specific proposal made by the Federal Trade Commission during the fairness doctrine inquiry. It nevertheless seems clear that the Commission intended to distinguish advertisements containing disputed product efficacy claims from standard product commercials generally promoting desirability and from editorial advertisements.

**34.** *See* 163 U.S.App.D.C. at 416, 502 F.2d at 418.

**35.** Nor do we find petitioners' other constitutional arguments persuasive. For reasons stated herein, we do not think that "the Commission has engaged in an arbitrary, irrational and unconstitutional discrimination between speakers based on the content of their speech," Brief of CEP and United Farm Workers at 19, by distinguishing for fairness doctrine purposes between speech which is editorial in nature and speech which promotes use of a product. We also do not think that the distinctions set out in

ers make two first amendment arguments. The first proceeds as follows:

(a) Commercial speech is protected under the first amendment because the public has an interest in the free flow of such information;[36]

(b) statements which oppose views presented in commercial advertisements are a form of commercial speech;

(c) thus, the public has an interest in the free flow of such statements;

(d) thus, the FCC must require its licensees to broadcast such statements.

But surely there is no right to broadcast a particular point of view simply because that point of view is protected by the first amendment. This was clearly established in *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973), which held that a network need not sell time to persons wishing to present their views on important public issues. Of course, this court has also recognized that speech protected by the first amendment need not necessarily be broadcast under the second obligation of the fairness doctrine.[37]

Petitioners' other first amendment argument begins with a slightly different application of *Virginia State Board*:

(a) to the individual, commercial information may be of more interest than is "the day's most urgent political debate," and such advertisements "may be of general public interest;"[38]

(b) thus, commercial advertisements contribute meaningfully to public debate;

(c) the Commission's decision not to subject commercial advertisements to the fairness doctrine is therefore unconstitutional because it is based on the denial of (b).

■ The last proposition is a non-sequitur. There is a missing link in the argument, which is that all speech which contributes meaningfully to public debate must be subject to the fairness doctrine. We reject the suggestion that any speech protected by the first amendment must, as a matter of constitutional law, trigger application of the fairness doctrine. While an ultimate function of both the first amendment and the fairness doctrine may be to encourage the dissemination of viewpoints and information, this does not mean that the two principles cover exactly the same ground.[39] There is an obvious difference between the standard employed by the Commission for determining whether the fairness doctrine applies to advertisements—that is, whether the advertisement advocates one side of a controversial public issue—and the holding in *Virginia State Board* that advertising is protected by the first amendment because it represents dissemination of valuable information important to the functioning of a free enterprise system. Nothing in the Supreme Court's decision in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), upholding the constitutionality of the political editorializing and personal attack rules promulgated under the fairness doctrine, suggests that the obligation to present opposing points of view must be applied to all constitutionally protected speech. Indeed, in most instances in which the fairness doctrine has been held not to

the *Fairness Report* are unconstitutionally vague.

36. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

37. *See, e. g., Neckritz v. FCC*, 163 U.S.App. D.C. 409, 502 F.2d 411 (1974); *Healey v. FCC*, 148 U.S.App.D.C. 409, 460 F.2d 917 (1972); *Green v. FCC*, 144 U.S.App.D.C. 353, 447 F.2d 323 (1971).

38. 425 U.S. at 763–64, 96 S.Ct. 1817.

39. In *CBS v. DNC, supra*, 412 U.S. at 131–32, 93 S.Ct. at 2101, the Court, after noting that the Commission was conducting the inquiry on the fairness doctrine which is the subject of this appeal, concluded that "courts should not freeze this necessarily dynamic process [of accommodating broadcast regulation and first amendment rights of broadcasters and the public] into a constitutional holding."

apply, the speech which it was contended triggered application of the obligation was clearly protected by the first amendment.[40]

We recognize that petitioners' confusion between the standard for first amendment protection and the standard for application of the fairness doctrine may result from misplaced reliance in the *Fairness Report* itself on the scope of first amendment protection. Issued before either *Virginia State Board* or *Bigelow v. Virginia*,[41] the *Report* appeared to equate its conclusion that standard product commercials "make no meaningful contribution toward informing the public on any side of any issue" with the statement by this court in *Banzhaf* (also decided prior to *Virginia State Board* and *Bigelow*), that "[p]romoting the sale of a product is not ordinarily associated with any of the interests the First Amendment seeks to protect."[42] The conclusion reached by the Commission is stated overbroadly; clearly, standard product promotions inform the public about many matters, such as price and efficacy. However, the *correctness* of the conclusion is not dependent upon whether or not advertisements are associated with first amendment values. The persuasiveness—or lack thereof—of the commission's essential finding, that standard commercials do not present "a meaningful discussion of a controversial issue of

public importance,"[43] is not altered by the recent expansion of first amendment protection in the area of commercial speech.

Indeed, it can be argued that the first amendment protection afforded commercial speech cuts precisely contrarily from the manner urged by petitioners. It has been contended by commentators,[44] although viewed skeptically by the Supreme Court,[45] that broadcasters are discouraged from presenting messages which trigger fairness doctrine obligations. If the fairness doctrine does have this chilling effect, then first amendment protection of commercial speech would make application of the fairness doctrine to such speech less, rather than more, desirable. This was certainly the context in which the *Banzhaf* court—upholding the Commission's decision to subject cigarette advertisements to the fairness doctrine—discussed the relevance of first amendment consideration.[46]

### D. *Statutory Challenges to the New Commission Policy*

■ It is alleged that the Commission's decision to withdraw standard product commercials from the purview of the fairness doctrine violates the standards of the Communications Act and was arbitrary, capricious and an abuse of discretion.[47]

---

40. *See, e. g.*, citations in note 37 *supra.*

41. 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). In striking down a Virginia statute prohibiting the advertising of abortion services, the Court stressed the public's interest in receiving such information, *id.* at 822.

42. 132 U.S.App.D.C. at 33, 405 F.2d at 1101, *quoted at Fairness Report* at 24–25.

43. *Fairness Report* at 25.

44. *See, e. g.*, Dissenting Statement of Commissioner Robinson to the *Reconsideration Order, supra* note 2, at 703–11.

45. *See Red Lion, supra*, 395 U.S. at 392–94, 89 S.Ct. 1794. *But see Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 257, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) ("Government-enforced right of access inescapably 'dampens the vigor and limits the variety of public debate,'" quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964)).

46. *See* 132 U.S.App.D.C. at 33, 405 F.2d at 1101 ("The speech which might conceivably be 'chilled' by this ruling barely qualifies as constitutionally protected 'speech.'").

47. Petitioners also contend that the mandate of the National Environmental Protection Act of 1969 (NEPA), that "to the fullest extent possible" federal agencies administer policies, regulations, and public laws in accordance with NEPA and make available information concerning the environment, 42 U.S.C. § 4332(1), (2)(F) (Supp. V 1975), requires that fairness doctrine obligations be imposed with respect to commercials for environmentally dangerous products. This position misinterprets the effect of NEPA on federal agency action. The FCC must give consideration to questions of environmental quality, *see Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission*, 146 U.S.App.D.C. 33, 36, 449 F.2d 1109, 1112 (1971). Accordingly, the Commission has indicated that "broadcasters must cover pollution issues generally, under their obliga-

In the 1959 amendments to the Communications Act, 73 Stat. 557 (1959), 47 U.S.C. § 315(a), Congress made clear that the already existing statutory requirement that broadcasters operate in the "public interest" included the obligation "to discuss both sides of controversial public issues," *Red Lion, supra,* 395 U.S. at 380, 89 S.Ct. at 1801. Petitioners contend that under this obligation, which the Supreme Court has said gave "statutory approval to the Fairness Doctrine," *CBS v. DNC, supra,* 412 U.S. at 110 n. 8, 93 S.Ct. at 2090, the Commission must apply the fairness doctrine "to advertisements for products whose effects have engendered important controversies over the sale and use of the products." Brief of CEP and United Farm Workers at 32. This contention is based on the view that at the time of the 1959 amendments, it was Commission policy to apply the *WCBS–TV* approach to fairness obligations and commercial advertisements; that Congress recognized this policy; and that the 1959 amendments were intended to put the policy in statutory form. We believe that there is no persuasive evidence supporting the basic premise upon which this view is based. It was not clear Commission policy in 1959 to require broadcast of opposing views in response to the advertisements for controversial products.

The 1946 decision concerning commercial advertisements so heavily relied on by petitioners merely stated that debate over the "relative merits of one product or another" could raise "basic and important social, economic, or political issues." [48] The *WCBS–TV* approach extended upon this principle in determining that the promotion of a controversial product was an important and controversial issue. The *Fairness Report* contracts the potential scope of the principle in requiring that the controversial issue be directly and obviously raised in the debate. But neither the *WCBS–TV* approach nor the *Fairness Report* is inconsistent with the principle announced in the 1946 Commission decision. [49] Thus, while the 1959 amendments to the Communications Act "codifi[ed] the standards of fairness," [50] we

---

tion to broadcast in the public interest." Letter to Russell Train, Chairman, Council on Environmental Quality (Nov. 30, 1970), discussing Letter to Gary Soucie, 24 F.C.C.2d 743 (1970). However, the Commission is certainly entitled, indeed is obligated, to determine how best to accommodate the mandate of NEPA with its own mandate to afford a "reasonable opportunity for the discussion of conflicting views on issues of public importance," § 315(a) of the Communications Act, 47 U.S.C. § 315(a) (1970). For reasons explained below, we think the Commission's view that this mandate would not be served by applying fairness doctrine requirements to advertisements for controversial products (whether controversial for environmental or other reasons) is not unreasonable. We also agree with the recent statement of the First Circuit in response to the same argument as that made here:

Given the prohibition in section 326 of the Communications Act against Commission censorship, we do not believe that . . . NEPA can be interpreted to compel the Commission to use its licensing power as a lever to impose special standards upon private licensees in the interest of the environment. *Public Interest Research Group v. FCC,* 522 F.2d 1060, 1068 (1st Cir. 1975), *cert. denied,* 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976).

**48.** *Sam Morris,* 11 F.C.C. 197, 198 (1946).

**49.** In at least one instance prior to 1959, one member of the Commission did informally express a policy very similar to that of *WCBS–TV.* In a letter dated August 11, 1949, to the Chairman of the Senate Committee on Interstate and Foreign Commerce, the Acting Chairman of the FCC explained that *Sam Morris* stood for the proposition that the mere commercial "plug" of liquor "may assume the proportions of a controversial issue of public importance," and that such advertising by itself could "raise serious social, economic, and political issues for the community," *reprinted at* Hearings Before the U.S. Senate Committee on Interstate and Foreign Commerce on S. 2444, 82d Cong., 2d Sess., at 7 (1952). This letter is not referred to in the congressional history of the 1959 amendments to the Communications Act.

**50.** Remarks of Chairman Pastore of the Senate Subcommittee on Communications, 105 Cong. Rec. 14462 (July 28, 1959). *But see also Red Lion, supra,* 395 U.S. at 385, 89 S.Ct. at 1804, "When the Congress ratified the FCC's implication of a fairness doctrine in 1959 it did not, of course, approve every past decision or pronouncement by the Commission on this subject, or give it a completely free hand for the future."

are not convinced that the *WCBS–TV* standard was one of the standards referred to.[51]

■ There still remains the possibility that the *WCBS–TV* approach inheres in the public interest standard of the Communications Act[52] regardless of whether Congress recognized this in 1959. We think that this view is unwarranted, and realize that both the Commission and this court used stronger language than was necessary in stating that the decision in *WCBS–TV* was "required by the public interest."[53] As this court[54] and the Supreme Court[55] have emphasized, the public interest would not be served by taking away from the FCC all discretion in its administration of the general principles of the fairness doctrine. Clearly, application of fairness doctrine requirements to commercial advertisements has been fraught with difficulties; remaining faithful to the general principles of the doctrine, the Commission should be allowed to alter the precise contours of the doctrine in a manner it reasonably believes will help resolve those difficulties. As we have demonstrated, two of the greatest uncertainties in administration of the *WCBS–TV* approach were (1) ascertaining what issues were "implicitly" raised by standard product commercials and institutional advertising, and (2) determining when a view on a controversial issue of public importance was expressed so elliptically that it could not be said to have been "raised" for purposes of

the fairness doctrine. The policies announced in the *Fairness Report* seem to us to be a straightforward attempt to remove these uncertainties by all-but-completely removing "implicit" advocacy from the confines of the fairness doctrine. As long as the Commission strictly enforces the core part two fairness obligation to present opposing points of view whenever there is direct, obvious, or explicit advocacy on one side of a controversial issue of public importance, it will be acting consistently with the public interest standard.

■ Nor do we believe that the Commission has acted arbitrarily or that it has abused its discretion in withdrawing most commercial advertisements from application of the fairness doctrine. Of course, the mere fact that the approach spelled out in the *Fairness Report* represents a definite change of policy does not require that it be struck down. *American Trucking Associations, Inc. v. Atchison, Topeka and Santa Fe Railway*, 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967). We further conclude that the Commission has "given reasoned consideration to each of the pertinent factors"[56] and that its policy choices with respect to the scope of the fairness doctrine are supported by substantial, though not necessarily conclusive, evidence.

It is important to track the exact reasoning employed by the Commission in its decision to overrule *WCBS–TV*. The Commis-

---

**51.** In *Banzhaf, supra*, 132 U.S.App.D.C. at 24, 405 F.2d at 1092, we stated that *Sam Morris* has "not been followed in the twenty years since it was decided," and was "not in any event a clear precedent for a ruling which instructs stations to broadcast opposition to their paid commercials." Statutory recognition of the fairness doctrine thus could not have included codification of the approach approved in *Banzhaf*.

**52.** Section 315(a) of the Communications Act, 47 U.S.C. § 315(a) (1970), defines this standard as affording "reasonable opportunity for the discussion of conflicting views on issues of public importance."

**53.** *Banzhaf, supra*, 132 U.S.App.D.C. at 24, 405 F.2d at 1092, quoting Applicability of the Fairness Doctrine to Cigarette Advertising, 9 F.C.C.2d 921, 943 (1967).

We expressly noted in a later decision that the Commission had authority to reformulate the commercial advertising policy established in *WCBS–TV*. *Friends of the Earth, supra*, 146 U.S.App.D.C. at 94, 449 F.2d at 1170.

**54.** *See, e. g., Banzhaf, supra*, 132 U.S.App.D.C. at 23, 25, 405 F.2d at 1091, 1093.

**55.** *See CBS v. DNC, supra*, 412 U.S. at 132, 93 S.Ct. at 2101 (fairness inquiry is one step in "a continuing search for means to achieve reasonable regulation compatible with the First Amendment rights of the public and the licensees").

**56.** *Permian Basin Area Rate Cases*, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

sion did *not* contend that standard product promotions do not implicitly raise the issue of the product's desirability. Rather, it concludes that mere promotion of a controversial product (that is, a product the use or purchase of which is controversial) does not constitute "meaningful" advocacy with respect to the merits of a "controversial issue of public importance," *Fairness Report* at 25. Petitioners contend that the Commission has thus arbitrarily excluded from the operation of the fairness doctrine one type of controversial issue: product desirability.

Given the reasons that the Commission puts forth for its new policy, such an outright fairness doctrine exemption for product commercials would not be arbitrary or an abuse of discretion. However, we are not convinced that petitioners' contention even correctly states what the Commission has done. When read in conjunction with that portion of the *Report* dealing with overt editorial and institutional advertising, the Commission's conclusion with respect to standard product commercials is more aptly characterized as being based on the view that the ultimate controversial issue of public importance is not the desirability of the product but the issues raised in the debate over desirability. Merely advocating the use of a product does not present information or involve discussion of these underlying issues; that is, promotional presentations are not "meaningful discussion[s] of . . . controversial issue[s] of public importance." When read in this manner, the *Fairness Report* has not arbitrarily excluded one class of issues from operation of the fairness doctrine; it has, rather, stated one standard for fairness doctrine application, quoted above, and refined and reformulated the definition of a controversial issue of public importance.

In any event, we think that the Commission has adequately supported its decision to exclude standard product commercials from the scope of the fairness doctrine. Three major arguments are presented by the Commission. First, the Commission made the judgment that the *WCBS–TV* approach to the fairness doctrine and standard product commercials at most informed the public about only one side of a controversial issue.[57] Since the underlying purpose of the fairness doctrine is to contribute to an informed public opinion,[58] the Commission determined that a change from the *WCBS–TV* approach was called for.

Certainly it must be admitted that counter-commercials are of a very different genre than are the product commercials themselves. They do not simply state, "Do not buy X; it is not desirable," but rather argue one side of the issues underlying the debate over desirability. Given this fundamental asymmetry, we do not think it was unreasonable for the Commission to conclude that application of the fairness doctrine to standard product commercials does not further the objective of presenting all viewpoints on controversial issues of public importance.[59]

The second major argument put forth by the Commission is that application of the fairness doctrine to noneditorial advertisements would "divert the attention of broadcasters from their public trustee responsibilities in aiding the development of an informed public opinion," *id.* at 26. This argument is of course premised to some extent on the first. We understand the Commission to be indicating that even if enforcement of fairness doctrine obligations with respect to commercial advertisements might marginally contribute to an informed public opinion, these benefits are outweighed by the reduction in public information which results from the decreased attention that broadcasters will afford to other

57. "In the cigarette case, for example, the ads run by the industry did not provide the listening public with any information or arguments relevant to the underlying issue of smoking and health." *Fairness Report* at 25.

58. *Report on Editorializing, supra* note 1, at 1249.

59. The same arguments apply, albeit with less force, to institutional advertisements which do not overtly and obviously advocate one side of a controversial issue.

aspects of the fairness doctrine. Given the wide range of controversial products to which the *WCBS–TV* approach could be applied[60] and the difficulties, discussed above, in determining which issues implicitly addressed give rise to fairness obligations, it is indeed quite possible that the effort broadcasters would have to devote to enforcing the fairness doctrine with respect to commercial advertisements would contribute relatively little to the overall objectives of the doctrine. We caution, however, that it is doubtful that the new FCC policy will substantially lessen the difficulties of drawing the line between advertisements which do and those which do not incur fairness obligations. The difference between obvious and unobvious advocacy is not obvious.

Finally, the Commission suggested in the *Fairness Report*, though not in its arguments to this court, that application of the fairness doctrine to commercial advertisements could undermine the economic base of commercial broadcasting. It is possible that sponsors would be discouraged from broadcasting advertisements subject to mandatory counter-commercials, and that broadcasters could suffer additional losses through operation of the *Cullman* principle under which they must bear the cost of presenting opposing views where paid spon-

sorship is not available.[61] Yet no evidence has been presented which indicates that the *WCBS–TV* policy[62] had an adverse effect on commercial broadcasters, though admittedly this may be due to the rather unvigorous and confused enforcement of that policy. While we do not think this economic argument is conclusive standing alone,[63] the other two arguments put forth by the Commission provide adequate and substantial support for its decision.[64]

## II

The FCC's decision to limit the applicability of the fairness doctrine lays upon it some obligation to consider carefully other serious suggestions that have been made to ensure sufficient and balanced coverage of important public issues. We conclude that two of the proposals rejected by the Commission in its *Fairness Report* and *Reconsideration Order* deserve further considerations at the agency level.

Both the Commission and reviewing courts have been acutely sensitive to the multiple dilemmas posed by government regulation of the broadcast media. First, there is the recognition that given the scarcity of broadcast channels, it is not possible that all who desire to speak through these media will be able to do so. A limitation both on the number of broadcast licensees

**60.** See Geller, *The Fairness Doctrine in Broadcasting: Problems and Suggested Courses of Action* 85 (Rand Corp. 1973) ("There are relatively few advertised products whose normal use does not involve some significant issue: automobiles (large or small), gasoline (leaded or unleaded), any type of medication, beer, airplanes, any product that does not have a biodegradable container, any foreign product—the list is virtually endless.").

**61.** *Cullman Broadcasting Co.,* 40 F.C.C. 576 (1963).

**62.** No generalizations can be drawn from the effect of the order in *WCBS–TV* itself, since that order applied to only one product. We do find it relevant, however, that apparently the cigarette manufacturers preferred a policy of no cigarette advertisements on television at all over the policy of requiring anti-smoking commercials, *see Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582, 588 (D.D.C.1971) (Wright, J., dissenting). This supports the sug-

gestion in the *Fairness Report* that full enforcement of the WCBS–TV policy could undermine the economic base of current broadcasting system.

**63.** The Commission apparently agrees. In its *Reconsideration Order, supra* note 2, at 699, the FCC stated, "Clearly, however, the economic impact on the broadcast industry was only one of many factors contributing to our choice of policy, and that factor alone is not of such critical importance as to cause a change of policy."

**64.** As additional support for our conclusion that the Commission's new policies with respect to commercial advertising are not unreasonable or arbitrary, we note that two respected students of the fairness doctrine and of FCC regulation generally have made substantially similar proposals. *See* Geller, *supra* note 60; Jaffe, The Editorial Responsibility of the Broadcaster: Reflections on Fairness and Access, 85 Harv.L.Rev. 768 (1973).

and on the number of viewpoints and topics covered is unavoidable.[65] It is further recognized that these limitations should be fashioned in a way that best furthers the interest of the public in receiving various viewpoints on important issues.[66] Inevitably this requires at least some government oversight of broadcasters' decisions as to which issues are covered. Enunciation and enforcement of the fairness doctrine is of course the primary mechanism employed by the FCC to accomplish this oversight. The Commission has chosen to rely primarily on third-party complaints and limited review of fairness doctrine decisions by individual broadcasters in order to avoid excessive governmental supervision of licensee operations. *Fairness Report* at 8.

Yet case-by-case, issue-by-issue enforcement of the second obligation of the fairness doctrine still requires considerable Commission intrusion into the licensee decision-making process. *Id.* at 10–11. At the same time, reliance on third party complaints means that many fairness violations will not be called to account with respect to both part one and part two obligations.[67]

The Commission procedures with respect to part two complaints are spelled out in the *Fairness Report.* The complainant must describe the station, issue, and program involved, and must also "state his reasons for concluding that in its other programming the station has not presented contrasting views on the issue." *Id.* at 19. An unavoidable consequence of these procedures is that complaints will not be received, or will not be acted upon, unless there exist persons or organizations who are simultaneously "regular" viewers or listeners of the relevant station,[68] aware that there exist opposing points of view to that presented by the station, and interested enough in having those opposing views aired that they are willing to initiate a Commission inquiry into the matter.

The potential for less than full enforcement of the first obligation under the fairness doctrine—provision of "a reasonable amount of time for the presentation . . . of programs devoted to the discussion and consideration of public issues"[69]—is even greater. Given the Commission's view that it is rare that a particular issue is "of such great public importance that it would be unreasonable for a licensee to ignore [it] completely," *id.* at 10, there exists very little incentive for members of the public, whom we may conclude are vitally concerned with a limited number of public issues, to initiate complaints relating to the first fairness obligation. A citizen would almost have to consider himself a guardian of the general public interest in being informed in order successfully to initiate such a complaint. Thus, it is not surprising that the usual fairness complaint relates to the part two obligation, *id.* at 8.[70]

■ The Commission received three major proposals designed to overcome these difficulties of current fairness doctrine enforcement.[71] Petitioner COM urged that

**65.** *See National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); *CBS v. DNC, supra.*

**66.** *See Report on Editorializing, supra* note 1; Section 315(a) of the Communications Act, 47 U.S.C. § 315(a) (1970) (requiring a "reasonable opportunity for the discussion of conflicting views on issues of public importance").

**67.** For a description of these obligations, *see* p. 8 & n. 13 *supra.*

**68.** *See Fairness Report* at 19 (complainants must state reasons for concluding that station has not presented contrasting views; complainants thus must "specify the nature and extent of their viewing or listening habits, and should indicate the period of time during which they

have been regular members of the station's audience").

**69.** *Id.* at 9, quoting *Report on Editorializing, supra* note 1, at 1244.

**70.** *See generally* Comment, Enforcing the Obligation to Present Controversial Issues: The Forgotten Half of the Fairness Doctrine, 10 Harv.C.R.C.L.L.Rev. 127 (1975).

**71.** Commission rejection of certain other proposals is also objected to on this appeal. We affirm the Commission's actions on these proposals. Petitioner NCCB asserts that there is a constitutional right of access for counter-commercials, arguing that the *CBS v. DNC* rationale for denying an access right for controversial

the Commission adopt as an optional substitute for the current fairness doctrine a system whereby licensees devote a specified percentage of their broadcast time to what COM labeled "free speech messages" and other public issue programing. Intervenor Geller requested the Commission to adopt a requirement "that the licensee list annually the ten controversial issues of public importance, local and national, which it chose for coverage in the prior year." [72] Mr. Geller also proposed that the Commission confine review of fairness doctrine complaints to the time of license renewal.

### A. The COM Access Proposal

The *Fairness Report* stated that the fairness inquiry did not disclose "any scheme of government-dictated access which we consider 'both practicable and desirable.'" The Commission concluded that (1) a system of paid access would favor wealthy spokesmen, (2) a system of first-come, first-served free access would "give no assurance that the most important issues would be discussed on a timely basis," and (3) any alternative system of free access would inevitably require the FCC to determine who should be allowed on the air. *Fairness Report* at 28–29 & n. 29.

After the *Report* was issued, COM petitioned the Commission to reconsider or clarify its position with respect to right-to-access policies voluntarily adopted by licensees. In its petition, COM proposed a specific access scheme, not presented to the Commission during the fairness inquiry itself, which would be deemed presumptive compliance with the fairness doctrine. Under the scheme suggested by COM:

1) A licensee would set aside one hour per week for spot announcements and lengthier programing which would be available for presentation of messages by members of the public.

2) Half of this time would be allocated on a first-come, first-served basis on any topic whatsoever; the other half would be apportioned "on a representative spokesperson system."

3) Both parts of the allocation scheme would be "nondiscretionary as to content with the licensee."

4) However, the broadcaster would still be required to ensure that spot messages or other forms of response to "editorial advertisements" are broadcast.

*See* J.A. at 421–22.

The Commission addressed COM's proposal in its order denying reconsideration, stating that while the proposal was "the first serious attempt to meet" what the Commission deemed the essential requirements of any access scheme, "[i]t is neither perfected nor ready for adoption as a rule or policy." *Reconsideration Order* at 699. The Commission also expressed the view that the COM system could be a supplement to, but not a substitute for, the current fairness doctrine requirements. *Id.*

We recognize that the Commission is not required in informal rulemaking to consider exhaustively every idea put forth

---

speech is inapplicable because the latter speech is covered by the fairness doctrine. However, we are not convinced that the holding in *CBS v. DNC* was premised on the specifics of the fairness doctrine. Certainly there is no guarantee under that doctrine that the particular message denied broadcast under paid access will be presented as part of fairness obligations. In any event, we fail to see how individuals seeking to present uncontroversial messages could have constitutional protection not afforded to individuals seeking to present controversial speech.

Intervenor Geller requested that the Commission require broadcasters to "consider" all editorial advertisements, because, according to Mr. Geller, "many broadcasters now pursue . . . a flat ban on any advertisement dealing with a controversial issue." Geller Brief at 36. The Commission gave this proposal "serious thought" but concluded that it was not practicable, *Fairness Report* at 29. The Commission's concern that this rule would cause unwarranted Commission intrusion into licensees' broadcast decisions is ample support for its conclusion. Intervenor Geller also seeks to have the Commission modify its current policies, as set out in the *Fairness Report* and *Reconsideration Order,* with respect to news slanting and political editorializing. We find no basis upon which to upset the Commission's policies in these areas.

**72.** Brief of Henry Geller at 33.

or to explain in detail the reasons why certain alternatives were rejected, *see Consumers Union of the United States, Inc. v. Consumer Product Safety Commission,* 491 F.2d 810, 812 (2d Cir. 1974). Nevertheless, we think that the COM proposal has desirable aspects that the Commission may have overlooked, and indeed that the Commission may not have correctly understood the true nature of the proposal. In these circumstances, we conclude that the Commission should give further consideration to the proposal, including the solicitation of comments thereon.

Our conclusions are prompted by the Commission's own criteria for what would constitute an acceptable "optional access system to be administered by the licensee, and supplemented by the fairness doctrine:"

> The essential requirements for any such system would be that [1] licensee discretion be preserved and [2] no right of access accrue to particular persons or groups. Furthermore, [3] the access system would not be permitted to allow important issues to escape timely public discussion. Most importantly, [4] the system must not draw the government into the role of deciding who should be allowed on the air and when.

*Reconsideration Order* at 699.

First, it seems to us that the Commission has not explained adequately why the COM proposal does not meet most of these requirements. The fourth requirement would be furthered even more than it is under present fairness doctrine enforcement, since under the COM proposal the licensee would be subject to fairness complaints only with respect to "editorial advertisements." The nondiscretionary apportionment system in the COM proposal would appear to be responsive to the second requirement listed

above. COM vigorously argues that the third requirement would be met because spokesmen will inevitably come forth to speak on important issues.[73]

The first FCC requirement is that "licensee discretion be preserved." COM argues that its proposal assures licensee discretion in that the licensee can decide not to adopt the access system and instead continue to operate under current fairness doctrine procedures. COM Brief at 43. But of course the discretion to which the Commission is referring is with respect to deciding which issues should be covered initially and which initial coverage requires the presentation of opposing points of view.

The Commission evidently bases this requirement on language in *CBS v. DNC, supra,* 412 U.S. at 125, 93 S.Ct. at 2097, that "the allocation of journalistic priorities should be concentrated in the licensee rather than diffused among many."[74] However, while the Court did state that " 'public trustee' broadcasting" should not be exchanged "for a system of self-appointed editorial commentators," *id.* at 125, 93 S.Ct. at 2098, it also stated that there might be devised "some kind of limited right of access that is both practicable and desirable," *id.* at 131, 93 S.Ct. at 2100. We cannot read *CBS v. DNC*—which held that broadcasters were not statutorily or constitutionally *required* to accept paid editorial messages—as indicating that voluntarily licensee adoption of a system of limited access such as that proposed by COM would violate the public interest standard of the Communications Act.[75] The COM proposal is of course not aptly characterized as solely "a system of self-appointed editorial commentators," because it would retain the broadcaster's present responsibility to present opposing points of view in response to editorial advertisements.

---

73. Brief of COM at 35. COM also points out that "under the present system, there is no assurance or requirement that once an offer of reply time is made, a contrasting viewpoint will actually be aired, if responsible spokespeople chose not to accept the offer." *Id.* We further note that where there is offered an opportunity to speak on an issue, but no one takes advantage of the opportunity, it is highly doubtful

that the issues could qualify as one of importance.

74. The opinion in *CBS v. DNC* also states:
 For better or worse, editing is what editors are for; and editing is selection and choice of material.
 412 U.S. at 124, 93 S.Ct. at 2097.

75. *See* note 66 *supra.*

Moreover, in stating its "essential requirements" for an access system as a substitute for the current fairness doctrine, the Commission appears to want to have its cake and eat it too. If the preservation of journalistic "discretion" under the first requirement is meant to mandate that all decisions with respect to which issues are covered be left to the licensee, then substantial government involvement in the form of agency oversight, contrary to the spirit if not the letter of the fourth requirement, cannot be avoided. We do not think that the Commission has demonstrated in the *Fairness Report*, in the *Reconsideration Order*, or in its written and oral arguments to this court that the COM proposal retains insufficient licensee discretion.

Nor do the Commission's stated requirements take into account all crucial elements of an access scheme, or indeed any other mechanism of fairness doctrine enforcement. Certainly, the "essential requirements" must include some consideration of the scheme's likely success in meeting the first obligation of the fairness doctrine: the coverage of controversial issues. We have already described the limited extent to which current enforcement procedures can assure that this obligation is fulfilled, and we understand the reluctance of the Commission to become more involved in dictating which issues must be covered under the obligation. COM's proposal will involve the Commission even less than do present procedures in overseeing compliance with the first obligation. At the same time, the proposal would ensure a minimum amount of coverage of public issues.

Similarly, we think that the Commission cannot ignore the advantage of an access system in providing information to the public which would not be provided under even full compliance with both obligations of the fairness doctrine as currently implemented. For instance, we have sustained the Commission's decision to exclude standard product commercials from the part two fairness obligation. Although we have determined that presentation of counter-commercials is

not required by the public interest standard of the Communications Act, neither the Commission's decision nor our affirmance of it was based on the view that the information contained in counter-commercials is useless or harmful. Allowing presentation of these messages would certainly not be inconsistent with the Commission's statutory obligations. The only reservation about the utility of counter-commercials stated in the *Fairness Report* and *Reconsideration Order* was that they would present only one side of controversial issues of public importance.[76] But an access system could result in presentation of information opposing the purchase of certain products *and* messages opposing these counter-commercials.

We recognize of course, that there may be significant difficulties with the COM access proposal. For instance, there is no absolute assurance that the issues addressed during access time will be the most important or controversial issues facing the licensee's community, and even less assurance of balance in presentation of opposing viewpoints. In its further inquiry into the COM proposal, we expect the Commission to ascertain how serious these potential defects are and to examine whether they can be overcome. Throughout this process, it is especially important that the nature and scope of issue coverage under the proposed access scheme be compared to the degree of coverage actually achieved under the current system of fairness doctrine implementation, not to the coverage that would be achieved were both fairness obligations currently complied with and enforced.

### B. Other Proposals Relating to the First Fairness Obligation

In conducting further inquiry on the COM proposal, the Commission will have to examine how best to ensure that licensees devote a reasonable amount of time to programing on public issues, as is required under the first obligation under the fairness doctrine. We do not think that this examination should be limited to comparison of only two alternatives: present procedures

---

76. *Fairness Report* at 25; *Reconsideration Order, supra* note 2, at 698.

for implementing this obligation, on the one hand, and the COM proposal, on the other. There may well exist other ways of achieving compliance with the first obligation that deserve critical consideration, either in conjunction with, or as alternatives to, the procedures referred to above.

One of the proposals submitted to the Commission during the fairness inquiry seems especially promising as one step toward fuller compliance with the first fairness obligation. Intervenor Geller suggests that

> the licensee list annually the ten controversial issues of public importance, local and national, which it chose for the most coverage in the prior year, set out the offers for response made; and note representative programing that was presented on each issue.[77]

Mr. Geller made this proposal both during the fairness doctrine inquiry and in his petition for reconsideration of the *Fairness Report*.[78] There is no indication that this rather modest proposal has received the serious consideration it deserves. Although the Commission alluded to the proposal in its order denying reconsideration, it failed to state even in conclusory terms why the proposal was being rejected. Therefore, we conclude that further inquiry into the Geller proposal would be appropriate as part of, or as a supplement to, additional examination of the COM access scheme.

Mr. Geller failed to state exactly what he believed the Commission should do with the issue reports that it receives, and it is not our role to flesh out the details of this proposal. It does seem to us, however, that issue reports could be useful to the Commission in one or more ways. For instance, the Commission initially could review each annual list to determine whether it appears that the licensee fulfilled his part one obligation. If this is not obvious from the list, or if the Commission had received complaints concerning the overall issue cover-

age afforded by the licensee, the Commission might conduct further inquiry into the licensee's issue coverage. Alternatively the Commission might take no immediate action with respect to the annual reports, but instead examine them at the time of license renewal. We leave it to the Commission's further examination to consider whether these or other uses of annual reports such as those proposed by Mr. Geller would be appropriate in enforcement of the fairness doctrine. The Commission may find it necessary to consider also under what standard the annual reports might be reviewed. We likewise leave to the Commission the determination of how best to conduct further inquiry into Mr. Geller's proposal, including whether this inquiry should be conducted separately from or as part of the further inquiry into the COM proposal.

### C. *Review at Renewal Only*

Under a wholly separate proposal put forth by intervenor Geller, both during the fairness inquiry and in his petition for reconsideration, the FCC would abandon its current case-by-case consideration of fairness doctrine complaints, and return to its pre-1962 practice of ascertaining at renewal time whether or not the licensee has complied with the fairness doctrine.[79] The proposal further suggests that the standard of review at renewal time be limited to whether there is "an indicated pattern of a flagrant nature, akin to 'malice' or bad faith or 'reckless disregard' of fairness obligations." Brief of Henry Geller at 11–12.

 This proposal is directed at reducing the amount of government interference in the everyday editorial decisions of licensees. This objective was a major consideration in the decision in *CBS v. DNC, supra*, which held that there exists no statutorily or constitutionally mandated right of access for paid editorial broadcasts. But we think that intervenor errs in inferring

---

77. Brief of Henry Geller at 33.

78. *See* J.A. at 469–472.

79. This change in practice was effected first with respect to cases involving personal attacks, *see Tri-State Broadcasting Co.*, 40 F.C.C. 508 (1962).

from isolated language in that decision[80] that the case-by-case determinations made by the FCC under current procedures for fairness doctrine enforcement are invalid under the Communications Act and under the Constitution. If the Court in *CBS v. DNC* had intended to invalidate all case-by-case procedures employed by the FCC, it is unlikely that it would have reaffirmed *Red Lion, supra*, decided by the Commission in just this manner, without at least mentioning its disapproval of the manner in which that case had come before it.[81]

We therefore conclude that the Commission is neither constitutionally nor statutorily *required* to return to its pre-1962 method of fairness doctrine enforcement. Nor do we think that its rejection of the proposal that it do so was unreasonable or arbitrary. It is not contended that the Commission failed to give the proposal serious consideration.[82] The Commission concluded that the proposed renewal assessment could not be made without inquiring into individual complaints, inquiries which would often be made on the basis of stale records. The Commission also argued—we believe convincingly—that review only at the time of renewal would discourage the filing of specific complaints from persons who sought to present opposing views in a timely fashion, and would deny the Commission the ability "to remedy violations before a flagrant pattern of abuse develops," *Fairness Report* at 18. In light of these considerations, we think the Commission correctly concluded that the specific renewal-only approach set forth by intervenor is not practicable at this time.

## IV

In summary, we reject the challenges to the Commission's decision to exempt product commercials which do not "obviously and meaningfully address a controversial issue of public importance" from fairness doctrine obligations, and find no merit in the contentions that the Commission has violated the substantive and procedural requirements of NEPA. We also affirm the Commission's decisions to continue its policy of case-by-case consideration of fairness complaints and its policies relating to licensee consideration of editorial advertisements, news slanting and political editorializing. However, we remand the orders reviewed on this appeal with instructions that the Commission undertake further inquiry into petitioner COM's access proposal and intervenor Geller's "10 issue" proposal in accordance with this opinion.

*It is so ordered.*

**80.** 412 U.S. at 126–27, 93 S.Ct. at 2098 ("Under . . . [the] right-of-access system urged by respondents . . ., the Commission would be required to oversee far more of the day-to-day operations of broadcasters' conduct, deciding such questions as whether . . . a particular viewpoint has already been sufficiently aired"); *id.* at 125, 93 S.Ct. at 2097 ("It was reasonable for Congress to conclude that the public interest in being informed requires *periodic* accountability on the part of [broadcasters].") (emphasis added); *id.* at 120, 93 S.Ct. at 2095 (the "unmistakable Congressional purpose [is] to maintain . . . essentially private broadcast journalism held only *broadly accountable to public interest standards.*") (emphasis added) (opinion of Burger, C. J.).

**81.** *Red Lion* did not sustain the Commission's fairness doctrine procedures. Although the Court upheld the fairness doctrine and the Commission's finding of a violation in that case, it did not have occasion to rule on the validity of the process by which the licensee before it was found to have violated the doctrine. *See National Broadcasting Co. v. FCC [Pensions]*, 170 U.S.App.D.C. 173, 188, 516 F.2d 1101, 1116 (1974), *vacated as moot, id.* 170 U.S.App.D.C. at 252, 516 F.2d at 1180 (1975), *cert. denied*, 424 U.S. 910, 96 S.Ct. 1105, 47 L.Ed.2d 313 (1976).

**82.** As previously stated, "[Mr. Geller's] position is a serious one, and it deserves serious consideration." *Pensions, supra*, 170 U.S.App.D.C. at 188, 516 F.2d at 1116. The Commission explained the proposal and the reasons for its rejection in both the *Fairness Report* (at 18) and the *Reconsideration Order* (*supra* note 2, at 693–94).